## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **WILLIAM I. DUDLEY, JR.** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil No. 11-1447 (RCL)** |
| ) | |
| **WASHINGTON METROPOLITAN** ) | |
| **AREA TRANSIT AUTHORITY** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff William Dudley, Jr. has worked as a Sign and Shelter Mechanic for defendant Washington Metropolitan Area Transit Authority ("WMATA") for over two decades.  Dudley brings this Title VII discrimination, hostile work environment, and retaliation suit, alleging that his supervisors routinely gave White employees special treatment and singled out Black employees for harsh criticism and unfair punishment.  In particular, Dudley claims that while White employees frequently flouted WMATA's attendance policy without repercussion, supervisors strictly enforced the policy against African Americans.  Dudley avers that, after complaining about racial discrimination, he became the target of disrespect, condescension, baseless write-ups and suspensions, and retaliatory work assignments.

Before the Court is defendant WMATA's Motion for Summary Judgment, July 31, 2012, ECF No. 14.  Upon consideration of the defendant's motion, the plaintiff's Opposition, Sept. 10, 2012, ECF No. 19, the defendant's Reply thereto, Oct. 22, 2012, ECF No. 33, and the record herein, the Court will grant defendant's motion and dismiss the action with prejudice.

# I.      BACKGROUND

William Dudley, Jr. has worked for WMATA since November 1989, and has held the

position of Sign and Shelter Mechanic AA since 1999.   Affidavit of William I. Dudley, Jr.

("Dudley Aff.") ¶ 1, Sept. 6, 2012, ECF No. 19-4; Def.'s Statement of Material Facts not in

Dispute ("Def.'s SMF") ¶ 1, July 31, 2012, ECF No. 14; Pl.'s Statement of Material Facts in

Dispute ("Pl.'s SMF") 10, Sept. 10, 2012, ECF No. 19-1 (not disputing Def.'s SMF ¶1).   Dudley

is responsible for repairing and replacing bus stop signs and shelters.   Dudley Aff. ¶ 1.

Dudley is African American.   From 2005 to approximately February 2008, James Lacey,

a Caucasian, held the title of Bus Maintenance Supervisor and supervised Dudley.   Def.'s SMF

¶¶ 1–3; Pl.'s SMF 10 (not disputing Def.'s SMF ¶¶ 1–3).    In February 2008, WMATA

transferred responsibility for the Sign and Shelter Shop—where Dudley worked—from Bus

Maintenance to Bus Planning.   Since then, Scottie Borders, an African American Senior Program

Manager for Bus Planning, has supervised Dudley.   Def.'s SMF ¶¶ 3–4; Pl.'s SMF 10 (not

disputing Def.'s SMF ¶¶ 3–4).

Dudley's Complaint alleges a series of instances of alleged discriminatory and retaliatory

events that took place between June 2007 and May 2011.   Compl. ¶¶ 6–18, Aug. 8, 2011, ECF

No. 1.   The Complaint asserts race discrimination, hostile work environment, and retaliation

claims under Title VII of the Civil Rights Act.   Compl. ¶¶ 21–26.

### A.      Mr. Dudley's June 2007 One Day Suspension for
### Violating WMATA's Attendance Policy

The WMATA Bus Services Employee's Handbook establishes a policy by which

WMATA may discipline employees for repeatedly reporting to work late.   Ex. 5 to Def.'s Mot.

Summ. J. (excerpts of Bus Services Employee's Handbook).   Employees who arrive late or out

of uniform, or who fail to report at all, are assessed "points" in their record for each incident.   *Id.*

2

For late reports under twenty minutes, employees receive one point.  Employees who fail to report receive four points.  WMATA issues a one-day suspension for employees who accumulate eight points within one 365-day period.  *Id*.  Management does not assess any points for two late arrivals under twenty minutes; therefore, an employee who WMATA suspends under the policy has actually arrived late ten times in one year.

Between July 31, 2006, and June 16, 2007, Dudley arrived late to work ten times.  Ex. 6 to Def.'s Mot. Summ. J. (Record of Disciplinary Action for Unscheduled Absences).  Lacey did not assess any points for two of Dudley's late reports; on June 16, 2007, Dudley accumulated eight points.  *Id*.  Pursuant to WMATA policy, Lacey suspended Dudley for one day, which Dudley served on June 18, 2007.  Ex. 6 to Def.'s Mot. Summ. J.

After meeting with the WMATA Office of Civil Rights, Ex. 9 to Pl.'s Opp'n, Dudley completed an EEOC Intake Questionnaire on November 6, 2007, Ex. 10 to Pl.'s Opp'n.  In the Questionnaire, Dudley alleged that Lacey discriminatorily enforced the attendance policy and that his one-day suspension was the result of racial discrimination.  Ex. 10 to Pl.'s Opp'n.  Dudley also stated, "I also feel that the comments and actions by (Lacey) management has created an intimidating, offensive, stressfull [*sic*], and hostile working environment for me."  *Id*.

On January 7, 2008, Dudley signed an EEOC Charge of Discrimination, stating that he was "unjustly issued a disciplinary write up for violating [WMATA]'s policies" on June 16, 2007, and later on August 31, 2007, "was suspended from employment for violating [WMATA]'s policies."  Ex. 11 to Pl.'s Opp'n.  Dudley stated, "I believe that I was discriminated against based upon my race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended."  *Id*.  The charge stated the earliest date of the discrimination was on "06-16-2007,"

and the latest on "08-31-2007."  *Id*.  Dudley did not check the form's "Continuing Action" box.  *Id*.  The EEOC sent Dudley a Right to Sue Notice on May 17, 2011.  Dudley Aff. ¶ 22.

**B.    Claims of Harsh Treatment Following EEOC Charge**

Dudley alleges that after he filed his EEOC Charge, Lacey and other management officials began to treat him more harshly.  Dudley states that "Lacey regularly spoke to me in a derogatory and condescending manner at morning 'toolbox' meetings where he gave out assignments to the employees, he gave me what I believed were retaliatory job assignments, singled me out for criticism, used intimidating language towards me, constantly harassed me, and wrote false statements about my work."  Dudley Aff. ¶ 8.

In particular, Dudley alleges that in "July 2008 Lacey gave me a verbal warning for parking my personal vehicle in the Bus II parking lot behind the shop and transferring my tools between my personal vehicle and my work truck, even though all the Sign and Shelter Mechanics who are assigned a company vehicle do the same thing on a daily basis and Lacey did not reprimand other employees."  *Id*. ¶ 9.

**C.    Co-Worker Peter White's July 2008 Incident**

On July 19, 2008, Dudley claims that he was the victim of unwarranted and unprovoked threats from Peter White, a Caribbean-Black co-worker.  Dudley Aff. ¶ 10.  When Lacey initially investigated the incident, he described it as "unprofessional behavior between co-workers," which Dudley took to suggest that he was "at fault as well as White."  *Id*.; *see also* Ex. 13 to Pl.'s Opp'n.  After supervisors completed the investigation, Lacey gave White a written reprimand and referred him to attend a Workplace Violence Awareness Class.  Ex. 12 to Def.'s Mot. Summ. J.  Lacey did not discipline Dudley for his incident.  *Id*.  White later filed a grievance,

and WMATA agreed to remove "all paper work and material related to th[e] grievance…from all the employee personnel files." Ex. 13 to Def.'s Mot. Summ. J.

### D.    Mr. Dudley's June 2009 Written Reprimand for Unprofessional Behavior

On June 24, 2009, Lacey completed an investigation of a verbal disagreement between Dudley and his co-worker, Kehinde Ogundiran.  Dudley asserts that he made an innocuous comment about meeting Ogundiran's sister-in-law, to which Ogundiran responded angrily.  Ex. 15 to Pl.'s Opp'n.  Dudley characterizes Lacey's report as a write up "for unprofessional behavior among co-workers," *see* Pl.'s Opp'n 5, but WMATA insists that Lacey did not discipline either employee, *see* Def.'s Mot. Summ. J. 8.  Dudley filed a grievance requesting that WMATA remove the investigation report from his personnel file, worried about it being used for future discipline.  Ex. 24 to Pl.'s Opp'n.  Lacey denied this grievance, Ex. 16 to Def.'s Mot. Summ. J., and Dudley did not request further review.

### E.    Mr. Dudley's July 2009 Written Reprimand for Poor Work Performance/Insubordination

On July 24, 2009, Lacey assigned Dudley and a co-worker to work on a sign that was down, but Dudley claims that when the men arrived they could not do the work because they did not have the proper tools with them.  Dudley Aff. ¶ 12.  Dudley says that he secured the sign and moved on to higher priority assignments.  Dudley alleges that on July 29, 2009, his co-worker was absent, and he went to Lacey's office to ask for help; after waiting three hours for Lacey to speak with him, he left to complete other jobs.  The next day, Dudley again asked for help, and Lacey assigned Damien Wood to assist him.  When the men arrived at the location of the down sign, Dudley claims that a maintenance man had disposed of the sign, and that he and Wood did not have that kind of sign with them in their truck.  *Id.*

On July 31, 2009, Lacey asked Dudley to explain why, a week later, the down sign still had not been fixed.  The parties disagree on how this conversation went.  Dudley asserts:

> Lacey began berating me for not completing the job the previous day and refused to listen to my explanation or talk to anyone else about why the work had not been completed.  Lacey told me that I was to go out with William Arrington and get the job done that day.  As I started to leave and Arrington came into the office, Lacey yelled at me in Arrington's presence to "stand right there and listen to me" as if I were a child.  I was angry and embarrassed and walked to the restroom to avoid a verbal confrontation.  Lacey, however, continued yelling at me to "come back here" and "we're going to the Superintendent's Office."

Dudley Aff. ¶ 12.  WMATA's version of the events is different:

> Mr. Dudley became verbally combative, walked away, and refused Mr. Lacey's direction to report to Superintendent Joseph Royer and explain why he left the job undone.  Based upon Plaintiff's behavior, Mr. Lacey ordered him to report for a drug and alcohol test.  In preparing the report regarding the incident, Mr. Lacey originally referred to it as "poor work performance."  However, after consulting with the Superintendent, the matter was documented as "insubordination."  Mr. Dudley received a written reprimand, but was not suspended.

Def.'s Mot. Summ. J. 8–9; *see also* Exs. 17–23 to Def.'s Mot. Summ. J. (supporting evidence for this version of the events).  Dudley claims, "Lacey changed the writeup of Dudley to 'insubordination' because Lacey was told that it was improper to send an employee for drug and alcohol testing based upon an allegation of 'poor job performance.'" Pl.'s Opp'n 6.

### F.  Mr. Lacey's July/September 2009 Order that Mr. Dudley Finish Installing a Bus Stop Previously Assigned to Another Employee

In June and September 2009,[1] Lacey assigned Dudley to complete work left unfinished by another employee.  Each time, Dudley complained that he should not have to do the job of other employees, and that the other employee should have been disciplined for not completing the job.  Exs. 17, 21 to Pl.'s Opp'n.  He filed grievances, stating that he thought these work

---

[1]  Dudley's opposition brief states that these events happened in 2008.  Pl.'s Opp'n 9.  But the exhibits cited in the brief clearly indicate that these events happened in 2009.  *See* Exs. 17, 21 to Pl.'s Opp'n.

assignments were retaliatory and evidence of discrimination.  *Id.*  WMATA denied these grievances, and Dudley did not pursue the matter any further.

### G.      Mr. Dudley's Attempt in September 2009 to Review his Personnel File

On September 3, 2009, Dudley sought to review his personnel file.   Acting Superintendent Joseph Royer said he would allow Dudley to review the prior year of his personnel file, but Dudley refused this offer.  *See* Exs. 42–43 to Def.'s Mot. Summ. J.; Dudley Aff. ¶ 15.   Dudley filed a grievance—which Royer denied—and Dudley did not pursue the matter any further.  Exs. 42–43 to Def.'s Mot. Summ. J.

### H.      The Fall 2009 Toolbox Meeting and the "Tap Dance" Comment

In Fall 2009, [2] at a morning 'toolbox' meeting, Lacey asked an African American employee if he wanted to "do a tap dance" for the group.  Lacey claims he made the statement because the Black employee was fidgeting, and did not understand its racial implications.  Ex. 24 to Def.'s Mot. Summ. J.  After the meeting, several Black employees complained and informed Lacey that his comments were racially insensitive.  That morning, Lacey reconvened a meeting and apologized for his comments.  Dudley was not present at the meeting where Lacey made the original comment, but he was present at the meeting where Dudley apologized.  *Id.*

### I.      Mr. Dudley's December 2009 "Constructive Demotion" and Referral to the Employee Assistance Program

In December 2009, WMATA instituted a bus route change in Silver Spring, Maryland. During the time WMATA undertook this project, Dudley missed five days of work on sick leave. He was absent on December 14, and when he returned to work on the 15th, he was assigned to assist Dante Proctor and did not lead the work that day.  Proctor does not typically work in the Sign and Shelter Shop, but he was present the day before.  Dudley was again on sick leave from

---

[2]   Dudley states that the meeting happened "[i]n October 2009."  Pl.'s Opp'n 11.  WMATA states that the meeting happened on November 17, 2009.  Def.'s Mot. Summ. J. 9.

December 16 through December 21.  *See* Exs. 25–30 to Def.'s Mot. Summ J. (evidentiary documents).   When Dudley returned on the 22nd, he was again assigned to assist Proctor.  WMATA asserts that it assigned Dudley to assist because "Proctor knew of the status of the service change."  Def.'s Mot. Summ. J. 10.  Dudley argues that since "this was [his] regular job, [ ] he didn't need to be 'brought up to speed' on assignments that are routinely assigned each day."  Pl.'s Opp'n 7; *see also* Dudley Aff. ¶ 16.

Dudley "felt that [he] had been effectively demoted and humiliated in front of [his] coworkers and subsequently went to the WMATA Office of Civil Rights to file a retaliation claim about it and the other acts of harassment by Lacey, but...Devin Walker refused to take these claims."  Dudley Aff. ¶ 17.[3]  Dudley admits he "was upset" when meeting with Walker, but says he "made no threatening statements."  *Id*. ¶ 18.  Walker submitted an affidavit stating that, based on Dudley's tone and some of his comments, he became "concerned for [Dudley's] safety and the safety of his coworkers."  Affidavit of Devin L. Walker ¶ 3 ("Walker Aff."), July 31, 2012, ECF No. 15-1.  In particular, Walker claims Dudley stated that he would have to "drag [Lacey's] ass across the desk" in order for something to be done, and made a possibly threatening reference to an earlier incident where one WMATA employee stabbed another.  *Id*. ¶¶ 4–6.  Because of these concerns, Walker referred Dudley to the Employee Assistance Program ("EAP") where medical staff decided to hold Dudley off work until the matter was resolved.  *Id*. ¶ 7; Ex. 41 to Def.'s Mot. Summ. J. (under seal).  Dudley was held off work until February 16, 2010, and this time was charged against his sick leave.  Exs. 38, 39, 41 to Def.'s Mot. Summ. J.  Dudley filed a grievance regarding the use of his sick leave, Ex. 28 to Pl.'s Opp'n, but WMATA denied this grievance, Exs. 38, 39 to Def.'s Summ J.

---

[3]  Despite Walker's alleged discouragement, Dudley still filed an internal grievances regarding the incident.  Ex. 25 to Pl.'s Opp'n.

**J.**     **Mr. Dudley's May 2010 Ten Day Suspension for**
           **Violating WMATA's Zero Tolerance Workplace Violence Policy**

On May 13, 2010, Dudley and William Adams—a Caucasian co-worker—were involved in a verbal altercation at work.  According to Dudley, Adams "confronted [Dudley] in the bus yard cursing and threatening to 'permanently close your eyes and make you stop breathing.'" Dudley Aff. ¶ 20.  Dudley claims he was "clearly not the aggressor in this incident," *id.*, but was nevertheless suspended for ten days for violating the WMATA zero-tolerance workplace violence policy, Ex. 33 to Def.'s Mot. Summ. J.

At the time of this incident, Lacey was no longer Dudley's supervisor but did supervise Adams.  After the incident, Lacey referred Adams to drug and alcohol testing, Ex. 32 to Def.'s Mot. Summ. J., and suspended Adams for twenty days, Ex. 33 to Def.'s Mot. Summ. J.  Scottie Borders, and African American, supervised Dudley at this time.  Borders issued Dudley a ten day suspension, Ex. 35 to Def.'s Mot. Summ. J., but Dudley alleges that the suspension was "based upon the decision of  [Devin] Walker and other managers," and that "Borders told [him] that he did not share the view that [Dudley] should be suspended," Dudley Aff. ¶ 20.

Dudley filed a grievance challenging the suspension, Ex. 38 to Def.'s Mot. Summ. J., but Kevin Newman and the WMATA Office of Labor Relations denied the grievance on July 12, 2012, Ex. 39 to Def.'s Mot. Summ. J.  Dudley did not pursue this grievance any further.

**K.**     **Mr. Dudley's May 2011 Ten Day Suspension for**
           **Violating WMATA's Zero Tolerance Workplace Violence Policy**

On April 14, 2011, Dudley was involved in an altercation with Peter White, an African American co-worker.  According to Dudley, "White came into a room" where Dudley was, "closed the door behind him, and said, 'if you keep fucking with me all of you motherfuckers are going down.'"  Dudley Aff. ¶ 21.  On May 10, 2011, WMATA suspended both Dudley and

White for ten days.  Exs. 42–43 to Def.'s Mot. Summ. J.  At this time, Borders supervised

Dudley, and Borders issued the suspension.  *Id*.  However, Dudley alleges that "Borders did not

believe that I had instigated the incident," but that the suspension came "upon the

recommendation of [Devin] Walker and other managers."  Dudley Aff. ¶ 21.

## II.    LEGAL STANDARD

### A.    Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The mere

existence of *any* factual dispute will not defeat summary judgment; "the requirement is that there

be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247–48 (emphasis in original).  A

fact is material if, under the applicable law, it could affect the outcome of the case.  *Id*.  A

dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Id*.  Because "[c]redibility determinations, the weighing of the evidence, and

the drawing of legitimate inferences from the facts are jury functions, not those of a judge," the

"evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in

his favor."  *Id*. at 255.  A nonmoving party, however, must establish more than "the existence of

a scintilla of evidence" in support of its position.  *Id*. at 252.  The inferences drawn from the

evidence "must be reasonably probable and based on more than mere speculation."  *Rogers*

*Corp. v. E.P.A.*, 275 F.3d 1096, 1103 (D.C. Cir. 2002) (citations omitted).  In addition, the

nonmoving party may not rely solely on allegations or conclusory statements.  *See Greene v.*

*Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  The nonmoving party must present specific facts

that would enable a reasonable jury to find in its favor.  *Id*.  If the evidence presented is "merely

colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50.

## B.    Title VII Discrimination

Under Title VII of the Civil Rights Act, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1) (2006). The plaintiff must plead "two elements for an employment discrimination case: (i) the plaintiff suffered an adverse employment action (ii) because of the employee's race, color, religion, sex, or national origin." *Brady v. Office of Sergeant of Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).  In *Brady*, the D.C. Circuit stated:

> Lest there be any lingering uncertainty, we state the rule clearly: In a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas* [411 U.S. 792 (1973)].  Rather, in considering an employer's motion for summary judgment or judgment as a matter of law in those circumstances, the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?

520 F.3d at 494.

## C.    Title VII Hostile Work Environment

To establish a claim of a hostile work environment, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment occurred because of the plaintiff's protected status; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known

of the harassment in question but nonetheless failed to either take steps to prevent it or afford the plaintiff prompt remedial action. *Baloch v. Norton*, 355 F. Supp. 2d 246, 259 (D.D.C. 2005).

To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch v. Kempthorne,* 550 F.3d 1191, 1201 (D.C. Cir. 2008).   To prevail on a hostile work environment claim, a plaintiff must show that her employer subjected her to "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65 (1986)).   The conduct must be sufficiently extreme to constitute an alteration in the conditions of employment so that Title VII does not evolve into a "general civility code." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998).   "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.*

### D.      Title VII Retaliation

Title VII also prohibits an employer from "discriminat[ing] against" an employee because he has "opposed" a practice proscribed by Title VII or because "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."   42 U.S.C. § 2000e-3(a) (2006).   To make out a retaliation claim, a plaintiff must show "(1) that he opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against him; and (3) that the employer took the action 'because' the employee opposed the practice." *McGrath v. Clinton,* 666 F.3d 1377, 1380 (D.C. Cir. 2012).

Materially adverse actions are not limited "to those that are related to employment or occur at the workplace." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 57 (2006). However, a plaintiff must show that the employer's actions "would have been materially adverse to a reasonable employee." *Id.* at 68. Further, "an employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 56.

If the employer offers a "legitimate, non-discriminatory reason" for the materially adverse action, "the sole remaining question" becomes "retaliation *vel non*—whether, based on all the evidence, a reasonable jury could conclude that [the] proffered reason…was pretext for retaliation." *Pardo–Kronemann v. Donovan*, 601 F.3d 599, 603–04 (D.C. Cir. 2010) (internal quotation marks and citations omitted); *see also McGrath,* 666 F.3d at 113 n.3 ("[T]he only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation."). A plaintiff can show pretext "either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009) (*quoting U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)).

### E.     Title VII Exhaustion of Administrative Remedies

"In actions brought under Title VII, a court has authority over only those claims that are (1) contained in the plaintiff's administrative complaint or claims 'like or reasonably related to' those claims in the administrative complaint and (2) claims for which the plaintiff exhausted administrative remedies." *Pierson v. WMATA*, 821 F. Supp. 2d 360, 364 (D.D.C. 2011) (*citing Park v. Howard Univ*., 71 F.3d 904, 907 (D.C. Cir. 1995); *Caldwell v. ServiceMaster Corp*., 966 F. Supp. 33, 49 (D.D.C. 1997)). "It is the defendant's burden to prove by a preponderance of the

evidence that the plaintiff failed to exhaust administrative remedies." *Pierson*, 821 F. Supp. 2d at 364 (*citing Brown v. Marsh*, 777 F.2d 8, 13 (D.C. Cir. 1985) (stating that "because untimely exhaustion of administrative remedies is an affirmative defense, the defendant bears the burden of pleading and proving it")). "Dismissal results when a plaintiff fails to exhaust administrative remedies." *Pierson*, 821 F. Supp. 2d at 365 (*citing Rann v. Chao*, 346 F.3d 192, 194–95 (D.C. Cir. 2003) (affirming trial court's dismissal of plaintiff's ADEA claim for failure to exhaust administrative remedies); *Gillet v. King*, 931 F. Supp. 9, 12–13 (D.D.C. 1996) (dismissing plaintiff's Title VII claim because he failed to exhaust his administrative remedies)).

Title VII "requires that an employee exhaust her administrative remedies by filing a claim with the EEOC prior to filing suit in the district court." *Headen v. WMATA*, 741 F. Supp. 2d 289, 294 (D.D.C. 2010) (*citing* 42 U.S.C. §2000e-5(e)(1) (2006)); *see also Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) ("Title VII requires that a person complaining of a violation file an administrative charge with the EEOC and allow the agency time to act on the charge."). Title VII provides detailed procedures for bringing administrative charges, and its "charge filing provision [ ] 'specifies with precision' the prerequisites that a plaintiff must satisfy before filing suit." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) (*quoting Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47 (1974)). Title VII requires that "[a] charge…shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred" or within three hundred days if the person "initially instituted proceedings with a State or local agency with authority to grant or seek relief." 42 U.S.C. § 2000e-5(e)(1) (2006). "Only after the EEOC has notified the aggrieved person of its decision to dismiss or its inability to bring a civil action within the requisite time period can that person bring a civil action herself." *Park*, 71 F.3d at 907.

### III.   DISCUSSION

Dudley's Complaint lists a number of discrete instances of alleged discriminatory and retaliatory conduct, describing a wide range of conduct spanning several years.  However, the Court must be careful about which events it can and cannot consider.  Before determining whether each of these events gives rise to discrimination, retaliation, and hostile work environment claims, the Court must ascertain the extent to which plaintiff has exhausted his administrative remedies.  When analyzing each count, the Court must limit itself to events falling within a properly exhausted administrative charge, or for which there is an equitable justification for the failure to exhaust.

The Court determines that Dudley's Count I discrimination cause of action is limited to the events described in his January 2008 EEOC Charge.  Dudley's Complaint describes many discrete instances of discrimination that happen after the January 2008, but he has failed to administratively exhaust these discrete claims.  Dudley has provided no equitable reason to excuse this failure to exhaust.  As to the events covered by Dudley's EEOC Charge, WMATA has proffered a race neutral, non-discriminatory reason for suspending Dudley.  Dudley has not provided enough evidence to raise an inference of discrimination.  Dudley's primary evidence of discrimination—that WMATA allowed a White employee to work out of uniform—is not sufficient, as the two men are not sufficiently similar to make an apt comparison.  Therefore, defendant is entitled to summary judgment on Dudley's Count I discrimination cause of action.

The administrative exhaustion requirements for hostile work environment claims are more relaxed.  However, even when the Court considers as true all the events Dudley describes in his Complaint and opposition brief, Dudley has not shown a workplace permeated with

discriminatory ridicule, insult, or intimidation.   Therefore, defendant is entitled to summary judgment on Dudley's Count II hostile work environment cause of action.

Defendant is also entitled to summary judgment on Dudley's Count III retaliation cause of action.   When the Court limits its analysis to the events described in the exhausted charge— and events that could be reasonably expected to come out of an EEOC investigation into the charge—plaintiff has failed to even make a prima facie case for retaliation.   The time between the last protected activity and the next adverse action is far too long to support an inference of causation, and Dudley has provided no direct evidence of retaliation to overcome this lack of temporal proximity.   Therefore, WMATA is entitled to summary judgment on all three Counts, and the Court will dismiss this action with prejudice.

### A.   Dudley's Count I Race Discrimination Claims

As noted above, Dudley complains about a wide variety of alleged discriminatory events. The Court must first determine which claims Dudley has properly exhausted.

### 1.   Exhaustion of Administrative Remedies for Racial Discrimination Claims

While Dudley claims that WMATA racially discriminated against him for years, and cites several examples of alleged discrimination, Dudley has not exhausted his administrative remedies for each discriminatory act.   In this case, the plaintiff has only exhausted his administrative remedies as to one EEOC Charge.   On January 7, 2008, Dudley filed a race discrimination charge with the EEOC.   *See* Ex. 3 to Def.'s Mot. Summ. J; Ex. 11 to Pl.'s Opp'n. In this Charge of Discrimination, Dudley stated the "particulars" as:

> I.   On 11/13/89, I was hired by Respondent to work as a Cleaner/Shifter. On 06/16/07, while I was employed by Respondent as a Sign/Shelter Mechanic AA, I was unjustly issued a disciplinary writeup for violating Respondent's policies.   Subsequently, on 8/31/97 [*sic*], I was suspended from employment for violating Respondent's policies.   By

contrast, Caucasian co-workers who have committed the same or
similar violations were subjected to little or no disciplinary action.

II.  I believe that I was discriminated against based upon my race, Black,
in violation of Title VII of the Civil Rights Act of 1964, as amended.

*Id*.  He checked the box indicating that this discrimination was based on "race," but left the

"retaliation" box unchecked.  *Id*.  The EEOC did not take any action, and issued a Right to Sue

Notice on May 17, 2011.  Pl.'s SMF ¶ 15; Dudley Aff. ¶ 22.

Dudley does not assert that he filed any other EEOC Charges or received any other Right

to Sue Letters.  He does not complain about any other discrete acts of discrimination that would

have fallen within the limitations period covered by his January 2008 EEOC Charge.  All of the

other instances of discrimination come *after* Dudley filed his EEOC Charge.  *Cf. Morgan*, 536

U.S. at 110–11 ("The [statutory] requirement…that the charge be filed 'after' the practice

'occurred' tells us that a litigant has up to 180 or 300 days after the unlawful practice happened

to file a charge with the EEOC….A discrete retaliatory or discriminatory act 'occurred' on the

day that it 'happened.'  A party, therefore, must file a charge within either 180 or 300 days of the

date of the act or lose the ability to recover for it.").  WMATA has proven this affirmative

defense by producing the EEOC Charge Dudley filed, and identifying its date and subject matter.

The Supreme Court has held that "[d]iscrete discriminatory acts are not actionable if time

barred, even when they are related to an act alleged in timely filed charges." *Id* at 113.  To

exhaust administrative remedies, "a Title VII plaintiff raising claims of discrete discriminatory or

retaliatory acts must file his charge within the appropriate time period."  *Id*. at 113–14.  "A party

must exhaust [his] administrative remedies within the Title VII limitations period for each

discrete act of discrimination alleged or lose the ability to recover for it."  *Lipscomb v. Winter*,

577 F. Supp. 2d 258, 271 (D.D.C. 2008); *see also Wada v. Tomlinson*, 517 F. Supp. 2d 148, 183

(D.D.C. 2007) ("[A] Title VII plaintiff is required to exhaust his or her administrative remedies with respect to each discrete allegedly discriminatory or retaliatory act….").

Some courts in this circuit have read *Morgan* narrowly, and found that incidents of discrimination or retaliation "like or reasonably related to those claims in the administrative complaint" do not need to be separately charged. *Pierson*, 821 F. Supp. 2d at 364. But even under this more forgiving standard, Dudley is restricted to the events described in his January 2008 EEOC Charge. Dudley's only properly filed and exhausted EEOC Charge is limited to his Fall 2007 suspension and warning for violating WMATA's attendance policies.[4] None of the other alleged instances of discrimination relate to WMATA's attendance policy, or derive from this or a similar set of facts. None of the other alleged instances of discrimination happened within 300 days prior to Dudley filing his EEOC Charge. Dudley claims that WMATA removed a record of discipline from Peter White's file, Compl. ¶ 10; that Lacey wrongfully wrote up Dudley for unprofessional behavior and insubordination on several occasions, *id*. ¶¶ 11–13; that WMATA placed Dudley on administrative leave after Dudley attempted to initiate a discrimination complaint, *id*. ¶ 14; that Joseph Royer denied Dudley the opportunity to fully review his employee file, *id*. ¶ 16; and that WMATA wrongfully suspended Dudley twice for violations of the workplace violence policy, *id*. ¶¶ 17–18. Regardless of the substantive merits of these claims, these are clearly discrete acts of discrimination requiring Dudley file a separate charge within the applicable limitations period. *See*, *e.g.*, *Park*, 71 F. 3d at 907–08 (a civil suit

---

[4]   Prior to filing the EEOC Charge, on November 6, 2007, Dudley completed an EEOC Intake Questionnaire. Ex. 10 to Pl.'s Opp'n. In this form, Dudley specifically complained about the June 16, 2007, write up for lateness and the August 31, 2007, suspension for accumulating ten points. *Id*. These are the same events described in his EEOC Charge. *Compare id. with* Ex. 11 to Pl.'s Opp'n. Additionally, Dudley stated in the Intake Questionnaire, "I also feel that the comments and actions by (Lacey) management has created an intimidating, offensive, stressfull [*sic*], and hostile working environment for me." Ex. 10 to Pl.'s Opp'n 2. Dudley also "consider[ed] discriminatory" "comments and actions by James Lacey towards me when meeting about write-ups." *Id*. at 3. The Court considers these allegations about a hostile work environment it is discussion of Count II. Nevertheless, these generalized complaints about a hostile work environment do not allege specific, discrete instances of discrimination that the Court could "pull into" Dudley's EEOC Charge and consider administratively exhausted.

under Title VII is only as broad as the scope of any investigation that reasonably could have been expected to result from the initial charge of discrimination).

Any connection between the acts properly charged and the later episodes is so tenuous that, if the Court found them to be related, it would completely undermine Title VII's detailed filing scheme and the Supreme Court's holding in *Morgan*. *Cf. Morgan*, 536 U.S. at 108 ("'strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law'") (*quoting Mohasco Corp. v Silver*, 447 U.S. 807, 826 (1980); *id*. at 109 (Title VII's "charge filing provision [ ] 'specifies with precision' the prerequisites that a plaintiff must satisfy before filing suit.") (*quoting Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47 (1974)). None of the subsequent incidents deals with WMATA's attendance policy, or events that derive from this allegedly unequal application of the attendance policy. Several episodes deal with discipline imposed by different supervisors. *See* Ex. 35 to Def.'s Mot. Summ. J. (Borders suspended Lacey in May 2010); Ex. 36 to Def.'s Mot. Summ. J. (Borders suspended Lacey in May 2011). If the only commonality were that WMATA supervisors took adverse action towards Dudley on the basis of Dudley's race, then Title VII's detailed procedures would become useless. Once Dudley files one discrimination charge, he would be able to fold in separate instances of discrimination without needing to file new charges.

Courts in this Circuit have split over whether a failure to exhaust administrative remedies presents a jurisdictional bar to suit. *Holmes v. PHI Service Co.*, 437 F. Supp. 2d 110, 119 (D.D.C. 2006) ("The Supreme Court has never expressly addressed whether Title VII's exhaustion requirement is, as a whole, jurisdictional or non-jurisdictional. Moreover, it has reached somewhat contradictory conclusions as to whether specific components of Title VII's exhaustion requirement are themselves jurisdictional prerequisites….The situation is not entirely

clear in the District of Columbia Circuit either.").   In *Holmes v. PHI Service Co.*, Judge Reggie Walton provides an excellent analysis of how district courts in this Circuit, lacking clear guidance from the Supreme Court or D.C. Circuit, have approached this issue.  *Id.* 119–25.  After carefully examining the case law, Judge Walton decided that failure to exhaust is not a jurisdictional bar and allowed suit to continue when the plaintiff received a Right to Sue letter after commencing suit.  *Id.* at 124–25.  This Court will follow Judge Walton's approach and consider whether there is any equitable reason to allow non-exhausted claims to go forward.

Plaintiff argues that exhaustion is "subject to wavier, exhaustion, and equitable tolling" and "a plaintiff may be excused if the court finds that there are equitable reasons for doing so." Pl.'s Opp'n 26 (*citing Kennedy v. Whitehurst*, 690 F.2d 951, 960 (D.C. Cir. 1982); *Siegel v. Kreps*, 654 F.2d 773, 777 (D.C. Cir. 1981)).   However, plaintiff argues that equitable tolling applies to his *retaliation* claims, not his unexhausted *discrimination* claims.  Pl.'s Opp'n 26–27 (under heading "To the Extent Necessary, Equitable Tolling Applies to Dudley's Retaliation Claims").   Even if Dudley meant to argue for tolling for his discrimination claims, equity does not excuse Dudley's failure to file a timely charge for each discrete discriminatory act.

"The plaintiff has the burden of pleading and proving any equitable reasons for his or her failure to comply with Title VII's time requirements."  *Bass v. Blair*, 514 F. Supp. 2d 96, 99 (D.D.C. 2007).   "The court's power to equitably excuse noncompliance with administrative filing deadlines, however, 'will be exercised only in extraordinary and carefully circumscribed instances.'"  *Smith-Thompson v. District of Columbia*, 657 F. Supp. 2d 123, 132 (D.D.C. 2009) (*quoting Mondy v. Sec'y of the Army*, 845 F.2d 1051, 1057 (D.C. Cir. 1988)).   "An employer does not engage in affirmative misconduct, justifying equitable estoppel, merely be touting its

internal procedures as the appropriate forum for resolving discrimination complaints." *Id.* (*citing Washington v. WMATA*, 160 F.3d 750, 752–53 (D.C. Cir. 1998)).

Dudley asks the Court to consider "a plaintiff's intelligence and familiarly with the process and whether defendant had actual notice of plaintiff's claims" when considering whether to apply equitable tolling. *Id.* at 26 (*citing Broom v. Caldera*, 129 F. Supp. 2d 25, 29 (D.D.C. 2001); *President v. Vance*, 627 F.3d 353. 362 (D.C. Cir. 1980). Other than mentioning that Dudley "dealt with the EEOC <u>pro se</u>," *id.*, plaintiff does not explain how plaintiff lacked intelligence or familiarly with the process in a way that would excuse his failure to exhaust. Lacking any contrary evidence, the Court may infer from Dudley's filing of an EEOC Charge in January 2008 that he was familiar enough with the process to know how to file a charge for later, discrete incidents of discrimination.

After submitting his initial charge, Dudley continued to send documents to the EEOC. *See* Ex. 32 to Pl.'s Opp'n; Dudley Aff. ¶ 22. Dudley claims that he "sought to amend [his] EEOC complaint" to include later events, but the "EEOC told [him] that it was premature because they hadn't gotten to [his] complaint yet." Dudley Aff. ¶ 22. Dudley states that he sent the EEOC over 400 pages of documents, providing information on later instances of discrimination and retaliation. *Id.* Dudley has included 58 of those pages as an exhibit. Ex. 32 to Pl.'s Opp'n. These pages include copies of internal grievances for later incidents, *id.*, which Dudley characterizes as instances of "retaliation." Dudley Aff. ¶ 22. This does not excuse Dudley's failure to file a separate EEOC Charge for each discrete incident of discrimination. Dudley has the burden of "pleading and proving any equitable reasons" for his failure to comply with Title VII's exhaustion requirements. *Bass*, 514 F. Supp. 2d at 99. Noticeably absent from Dudley's exhibits are: any correspondence between Dudley and the EEOC about amending the

charge, evidence that WMATA knew that Dudley continued to send the EEOC documents about later events, evidence as to *when* Dudley sent the EEOC these documents, evidence that Dudley did not know that he had to file separate charges for each act of discrimination, evidence that Dudley was misled by anyone about EEOC filing requirements, or the Right to Sue Letter itself.

Dudley continued to file internal grievances, but if filing internal grievances were sufficient, alone, to put WMATA on notice that Dudley intended to pursue Title VII actions, then requiring an EEOC Charge would be superfluous.   Plaintiff could simply avoid the administrative process entirely by filing an internal grievance, and proceeding directly to federal court if the employer denies that grievance.   "WMATA's internal procedures offer a separate forum for pursuing discrimination complaints, which does not displace…Title VII filing requirements." *Washington v. WMATA*, 160 F.3d at 753 (where WMATA "touted its internal procedure as the appropriate forum for resolving discrimination complaints," plaintiff not entitled to tolling because he "demonstrated no affirmative misconduct on the part of WMATA," nor did he show "that WMATA's decision letter disposing of his claim was misleading").

Dudley only filed one EEOC Charge relating to this suit, and that that Charge only discussed the one-day suspension and reprimand for violating WMATA's attendance policy. Finding that Dudley failed to exhaust his administrative remedies for the other instances of discrimination complained of, and finding no reason to apply equitable tolling, the Court will only consider the merits of the claims raised in the January 2008 EEOC Charge.

### 2.   Dudley's Prima Facie Case of Race Discrimination

The burden for establishing a prima facie case for discrimination under Title VII is not heavy.   Dudley needs to allege that he "suffered an adverse employment action…because of [his] race, color, religion, sex, or national origin." *Brady*, 520 F.3d at 493.   Dudley has shown that he

suffered an adverse employment action—being suspended for one day for violating WMATA's attendance policy, *see* Def.'s SMF ¶ 11; Pl.'s SMF 10 (not disputing Def.'s SMF ¶ 11)—and has alleged that it was because of his race—Dudley claims that White employees are not similarly punished for violating the attendance policy, *see* Pl.'s SMF 1–2; Dudley Aff. ¶¶ 3–9.   This establishes a prima facie case for racial discrimination.

### 3.    WMATA's Response & Dudley's Evidence of Discrimination

As noted by the D.C. Circuit, "the question whether the employee ma[kes] out a prima facie case is almost always irrelevant."   *Brady*, 520 F.3d at 493.   When "an employer has asserted a legitimate, non-discriminatory reason" for taking adverse employment action against the plaintiff, "the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?"   *Id.* at 494.

WMATA has offered a straightforward legitimate, non-discriminatory reason for suspending Dudley:   Dudley showed up late ten times in one year, violated a clear WMATA policy, and was suspended in accordance with that clear policy.   *See*   Exs. 6 & 7 to Def.'s Mot. Summ. J.; Def.'s SMF ¶ 11.   Even absent such a clear policy, courts have recognized tardiness as a legitimate non-discriminatory reason for taking adverse personnel action.   *See*, *e.g.*, *Clarke v. WMATA*, ___ F. Supp. 2d __, 2012 WL 5505242, *3–*4 (D.D.C. Nov. 14, 2012); *Turner v. Shinseki*, 824 F. Supp. 2d 99, 116 (D.D.C. 2011).   WMATA avers that it enforces this policy in a race-neutral manner, providing evidence that around the same time Lacey suspended Dudley, Lacey also suspended White employee Barry Brassford for similar conduct.   Exs. 8 & 9 to Def.'s Mot. Summ. J.; Def.'s SMF ¶¶ 12–13; Pl.'s SMF 10 (not disputing Def.'s SMF ¶¶ 12–13).

Dudley conceded that the showed up late ten times and violated WMATA's policy.  *See* Pl.'s SMF 10 (not disputing Def.'s SMF ¶ 11).

While conceding that he repeatedly reported late, Dudley contends that WMATA enforced its policy in a discriminatory manner—i.e., Lacey gave White employees favorable treatment under the policy, and strictly enforced it against Dudley.  *See*, *e.g.*, Dudley Aff. ¶¶ 4–6; Affidavit of Kenneth A. Ray ¶¶ 5–8, Aug. 24, 2012, ECF No. 19-6; Affidavit of Freddie L. Kenley ¶ 5, July 18, 2012, ECF No. 19-7; Declaration of James T. Lumpkins ¶ 11, May 14, 2012, ECF No. 20-1.  In particular, Dudley and his co-workers allege that a White employee named William Adams regularly came to work out of his official uniform.  *Id.*  According to witnesses and a picture taken by Dudley, Adams mocked the uniform policy by wearing an orange shirt with "Metro" printed on it.  *See*, *e.g.*, Ex. 7 to Pl.'s Opp'n.  Dudley claims that he and his co-workers brought this discrepancy to management's attention on numerous occasions, but management did not take their complaints seriously.  Dudley Aff. ¶¶ 5–6.  Dudley alleges Adams did not begin complying with the uniform policy until September 28, 2007, after WMATA issued a Staff Notice on the subject.  Dudley Aff. ¶ 6; *see also* Ex. 8 to Pl.'s Opp'n (memo informing all maintenance workers to wear official uniforms).

Dudley argues that the issues of "showing up late" and "showing up out of uniform" are part of the same WMATA policy, *see* Pl.'s Opp'n 1–2—specifically Rule 1.28, which states:

> (a)     Employees shall be in regulation work uniform, before punching their time card "IN," to begin the scheduled shift.  Employees shall be in their work area and promptly ready for any work assignment by their scheduled shift time.

> (b)     Employees not in regulation uniform, and not in their work area ready to perform their work assignment by their scheduled report time, will be subject to corrective action.

Ex. 2 to Pl.'s Opp'n 9 (Metro Rules and Regulations handbook).  The way plaintiff interprets this policy, the Rule requires "employees in the Office of Bus Maintenance…to report to work at 6:00 a.m. in uniform or they are considered late.  If they are out of uniform after 6:00 a.m., they are considered late regardless of when they punched in."  Pl.'s Opp'n 1–2.  Therefore, since Lacey overlooked Adams's frequent "lateness," but strictly enforced the policy as to Dudley, plaintiff argues that this raises issues of material fact as to WMATA's proffered explanation, and whether Dudley was the victim of intentional discrimination.  *See id*. at 15–18.

In order to rebut WMATA's proffered explanation, Dudley need not "demonstrat[e] that []he was treated differently from similarly situated employees who are not part of the protected class."  *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005).  Using such comparison evidence is one acceptable method; Dudley may also show that "the employer's proffered explanation is unworthy of credence," *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000), as "in appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose," *id*. at 147.

However, Dudley provides no such evidence that WMATA's proffered explanation is "unworthy of credence."  WMATA's legitimate explanation is that Dudley showed up late ten times, and was suspended in accordance with the policy; Dudley *admits* that he showed up late. Def.'s SMF ¶ 11; Pl.'s SMF 10 (not disputing Def.'s SMF ¶ 11).  Dudley claims, "Lacey's credibility is…called into question by his marking of WMATA's Record of Disciplinary Action for Unscheduled Absence forms as excused for late arrivals of White employees for reasons that he marked as unexcused for Black employees."  Pl.'s Opp'n 20.[5]  This does not undermine

---

[5]  If plaintiff uses this to argue that he should have received such excused absences, his argument is unavailing.  *See Clarke*, 2012 WL 5505242, *3 (WMATA employee "asserts that on the frequent occasions that he was late, he was only tardy by 10 minutes or so," but court does not find this evidence of pretext, as "Title VII does not allow 'judicial micromanagement' of employers' business practices.") (*quoting Baloch*, 550 F.3d at 1197).

Lacey's assertion that Dudley arrived late ten times; it goes to whether Lacey implemented the policy in a discriminatory manner, essentially by comparing the treatment of employees in a protected class with that of employees in a non-protected class.  Furthermore, Dudley tries to use all his unexhausted claims of retaliation and discrimination, and the constituent events of his hostile work environment claim, as "additional evidence…of discriminatory behavior exhibited by Lacey and others in management."  *Id*. at 19–20.  As discussed *infra*, the events Dudley complains of are not sufficiently severe and pervasive to constitute a hostile work environment.  These events do not show that Lacey was so racist and hostile towards Dudley that any explanation Lacey provides for the suspension would be "unworthy of credence."

While plaintiff is correct that using a "comparator" is not required, Pl.'s Opp'n 17–18, "comparator" evidence is the strongest evidence plaintiff has.  Nevertheless, Dudley's use of Adams as a "comparator" is not sufficient to overcome WMATA's proffered legitimate explanation.  When determining whether another employee is similarly-situated to the plaintiff:

> It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly-situated in all respects….Thus, to be deemed "similarly-situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Phillips v. Holladay Property Services, Inc.*, 937 F. Supp. 32, 37 (D.D.C. 1996) (*quoting Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)) (citations and formatting omitted).  Dudley and Adams share the same supervisor and have been subject to the same standards, but they have *not* engaged in the same conduct, and there are mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it.

In a Title VII case brought by a WMATA employee complaining that he was unfairly disciplined for showing up pate, Judge Contreras stated:

> [T]he plaintiff argues that similarly situated white employees arrived late to work without suffering similar consequences.  In general, a Title VII plaintiff may demonstrate pretext by showing that his employer gave favorable treatment to similarly situated employees of a different race.  *Brady*, 520 F.3d at 495; *Wicks v. Am. Transmission Co. LLC*, 701 F .Supp. 2d 38, 45 (D.D.C. 2010).  Yet to draw an apt comparison, the plaintiff must demonstrate that all relevant aspects of his employment situation were "nearly identical" to those of the other employees. *See Royall v. Nat'l Ass'n of Letter Carriers*, 548 F.3d 137, 145 (D.C. Cir. 2008). Here, the plaintiff alleges that Warren Woodward, a white employee, was often late but never punished.  Pl.'s Opp'n at 3 (claiming that Mr. Woodward had a habit of arriving late, but that "Ms. Wang had blatantly overlooked Mr. Woodward['s] tardiness in violating WMATA's arrival policy for years with no form of disciplinary action taken against him.").  The analogy is flawed.

*Clarke*, 2012 WL 5505242, *4.  Plaintiff's attempt to draw an analogy between himself and Adams is also flawed.

First, Adams and Dudley did not engage in the same conduct.  Rule 1.28 requires employees to be on time, and in uniform.  Dudley and Adams violated two distinct parts of this Rule.  If Dudley claimed that Adams repeatedly arrived after the report time—like Dudley did— and was not disciplined, this might present an apt comparison.  However, that is not the case. Lacey disciplined Dudley for showing after the report time, but Dudley was in uniform.  Dudley claims Adams was out of uniform, but does not allege Adams showed up after the report time. Dudley and Adams may have allegedly violated the same "rule," but they did not engage in the same *conduct* to violate that rule.  Dudley has not demonstrated that all relevant aspects of his employment situation were "nearly identical" to that of Adams.  *See Royall*, 548 F.3d at 145.

Second, WMATA has offered mitigating circumstances that would distinguish Dudley and Adams's conduct, and WMATA's treatment of them for it.  According to WMATA, Dudley and Adams had different job responsibilities—Adams worked as a welder and Dudley did not.

WMATA claims that the standard-issue polyester uniforms could pose a fire hazard to a welder such as Adams, and "safety is permitted to trump the letter of the rule, in this instance." Def.'s Mot. Summ. J. 14. Dudley claims that this explanation is baseless because Adams had the option to wear an official cotton uniform. Dudley Aff. ¶ 4. Regardless of whether Adams "needed" to wear something other than the official uniform to perform his job, WMATA has shown relevant differences between Adams and Dudley's job responsibilities that make a comparison between the two less apt. Dudley may have disagreed with Lacey's decision to let a White welder wear his street clothes to work, but this "favoritism" has little direct relationship to whether Lacey used Dudley's repeated tardiness as pretext for suspending Dudley.

When relying on a comparator to overcome the employer's proffered legitimate explanation, there must be a very close relationship between the compared employees. Where the employees engaged in different conduct to violate different aspects of the same rule, and the employee has offered mitigating circumstances to explain any perceived unfairness, there is not an apt enough comparison. Lacking sufficient direct or circumstantial evidence to rebut WMATA's proffered legitimate reasons for suspending Dudley and warning him about late reports, Dudley's Count I discrimination claim cannot survive summary judgment.

### B.     Dudley's Count II Hostile Work Environment Claim

Dudley claims that a series of racist and discriminatory actions by WMATA supervisors contributed to a hostile work environment. Compl. ¶¶ 23–24; Pl.'s Opp'n 1–13. To prevail on a hostile work environment claim, Dudley needs to show that his "workplace is permeated with discriminatory intimidation, ridicule and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (*quoting Harris v. Forklift Sys., Inc.*, 510

U.S. 17, 21 (1993)).   Such claims are "usually characterized by a series of events that cumulatively give rise to a claim, although each individual component might not be actionable on its own." *Craig v. District of Columbia*, __ F. Supp. 2d __, 2012 WL 3126779, *3 (D.D.C. Aug. 2, 2012) (*citing Morgan*, 536 U.S. at 115).   It does not matter whether Dudley's hostile work environment claim "is discrimination-based or retaliation-based…because the legal standard is the same for either theory." *Bonnette v. Shinseki*, __ F. Supp. 2d __, 2012 WL 5986466, *20 n.11 (D.D.C. Nov. 30, 2012).

### 1.   Exhaustion of Administrative Remedies for Hostile Work Environment Claim

The requirements for exhausting administrative remedies and timely filing charges are different for hostile work environment claims.   "Because a hostile work environment claim aggregates numerous occurrences, these claims are subject to a different timeliness analysis than claims involving discrete acts." *Craig*, 2012 WL 3126779 at *3.   Thus, Dudley "need only allege that one or more contributing acts occurred within the relevant time period" and "[i]t does not matter that some component acts may fall outside that period." *Id.*   This does not open the door "to recovery for time-barred claims," and the incidents falling outside of the period covered by the charge must be "adequately linked into a coherent hostile environment claim." *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011).

Dudley's EEOC Charge did not check the "continuing action" box or clearly complain about a hostile work environment.   *See* Ex. 10 to Pl.'s Opp'n; Def.'s SMF ¶ 16; Pl.'s SMF 12, ¶ 16 (not disputing that he failed to allege hostile work environment on EEOC Charge).   However, on the EEOC Intake Questionnaire, Dudley stated, "I also feel that the comments and actions by (Lacey) management has created an intimidating, offensive, stressfull [*sic*] and hostile working environment for me."   Ex. 10 to Pl.'s Opp'n 2.   Dudley also complained about alleged

discriminatory "comments and actions by James Lacey towards me when meeting about write-ups." *Id*. at 3.  Since Dudley clearly complained to the EEOC about a hostile work environment in his Intake Questionnaire, the Court assumes that his hostile work claim is "like or reasonably related to those claims in the administrative complaint," and would be within the "scope of any investigation that reasonably could have been expected to result from" looking into the January 2008 EEOC Charge.  *Pierson*, 821 F. Supp. 2d at 364 (internal quotation marks and citations omitted); *see also Holmes-Martin v. Leavitt*, 369 F. Supp. 2d 184, 191–93 (D.D.C. 2008) (allowing hostile work environment claim to proceed even though it was not specifically listed as separate cause of action in EEOC complaint).  Therefore, the fact that Dudley's official charge did not explicitly mention a hostile work environment does not prevent him from bringing his claims in federal court.

### 2.  Merits of Hostile Work Environment Claim

When the Court looks at the incidents Dudley describes, they are not enough to support a hostile work environment claim.  Dudley describes many events he believes, when taken as a whole, make up a hostile work environment.  But Dudley has failed to establish a prima facie hostile work environment claim.  When the Court considers the totality of the evidence proffered, and draws all reasonable inferences in favor of plaintiff, there are no genuine issues of fact, and no reasonable jury could find that plaintiff established a hostile work environment claim.  Simply put, Dudley "cannot meet the high burden of showing hostility in the work environment" at WMATA "that was 'severe,' 'pervasive.' and 'abusive.'"  *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 108 (D.D.C. 2005), *aff'd sub nom.*, *Nurriddin v. Griffin*, 222 F. App'x 5 (D.C. Cir. 2007).

The bulk of Dudley's hostile work environment claim consists of discrete instances of alleged discrimination or retaliation—the vast majority of which are unexhausted.[6]  Hostile work environment claims are usually "characterized by a series of events that cumulatively give rise to a claim."  *Craig*, 2012 WL 3126779 at *3.  Yet, "as a general matter" courts in this Circuit "frown on plaintiffs who attempt to bootstrap their alleged discrete acts of retaliation into a broader hostile work environment claim."  *Baloch v. Norton*, 517 F. Supp. 2d 345, 364 (D.D.C. 2007); *see also Franklin v. Potter*, 600 F. Supp. 2d 38, 76 (D.D.C. 2009) ("Because plaintiff's allegedly hostile events are the very employment actions he claims are retaliatory, he cannot so easily bootstrap alleged retaliatory incidents into a broader hostile work environment claim.").  Courts have "been reluctant" to transform "mere reference to alleged disparate acts of discrimination against plaintiff…into a hostile work environment claim."  *Lester v. Natsios*, 290 F. Supp. 2d 11, 32 (D.D.C. 2003).  Some courts have even gone as far as to state that "Plaintiff cannot [ ] rely on discrete acts upon which he bases his discrimination and retaliation claims to support a hostile work environment claim."  *Hampton v. Vilsack*, 760 F. Supp. 2d 38, 56–57 (D.D.C. 2011).  "Discrete acts constituting discrimination or retaliation claims…are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult."  *Lester*, 290 F. Supp. 2d at 33.  A plaintiff "cannot simply regurgitate [his] disparate discipline and retaliatory discipline claims in an effort to flesh out [his] hostile work environment claim."  *Wada v. Tomlinson*, 517 F. Supp. 2d 148, 210 (D.D.C. 2007) *aff'd*, 296 F. App'x 77 (D.C. Cir. 2008).

---

[6] Such as, *inter alia*, the July 2008 incident with Peter White, Compl. ¶ 10; the June 24, 2009, written reprimand for unprofessional behavior, *id*. ¶ 11; the July 31, 2009, written reprimand for poor work performance, later amended to insubordination, *id*. ¶ 13; the September 2, 2009, assignment to complete a bus stop project left unfinished by another employee, *id*. ¶ 12; the September 2009, attempt by Dudley to review his entire personnel file, Dudley Aff. ¶15; the December 2009 "constructive demotion" and subsequent referral to the Employee Assistance Program, Compl. ¶¶ 14–15; Dudley Aff. ¶¶ 16–18; the May 2010 ten day suspension for violating the Workplace Violence Policy, Compl. ¶ 17; and the May 2011 ten day suspension for violating the Workplace Violence Policy, *id*. ¶ 19.

The Court is especially concerned because plaintiff has failed to exhaust many of the discrete discriminatory and retaliatory events comprising his hostile work environment claim. The "plaintiff cannot cure his failure to timely exhaust his complaints about these incidents by sweeping them under the rubric of a hostile work environment claim." *Patterson v. Johnson*, 391 F. Supp. 2d 140, 146 (D.D.C. 2005) *aff'd*, 505 F.3d 1296 (D.C. Cir. 2007); *see also Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 82 (D.D.C. 2007) ("[C]obbling together a number of distinct, disparate acts will not create a hostile work environment....This is particularly true here because plaintiff failed to exhaust administrative remedies for many of the discrimination and retaliation claims that he now incorporates into a hostile work environment claim."). "[A] plaintiff's claim of hostile work environment will not be time barred if some of the acts fall outside the limitations period '*so long as all acts which constitute the claim are part of the same unlawful employment practice* and at least one act falls within the time period.'" *Id.* (*quoting Morgan*, 536 U.S. at 117) (emphasis in original). A plaintiff must show that the time-barred incidents are "adequately linked" with the exhausted incidents "into a coherent hostile work environment claim." *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011). To establish this linkage, a plaintiff may show that the exhausted and non-exhausted events "involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." *Morgan*, 536 U.S. at 120–21. Discrete acts, falling outside of the scope of the exhausted charge, are not "part of the same unlawful employment practice" for the purposes of exhausting a hostile work environment claim under *Morgan*.

This presents the first problem with Dudley's hostile work environment claim. Most of the discrete incidents of discrimination and retaliation are not "part of the same unlawful

employment practice," *Morgan*, 536 U.S. at 117, as the events described in Dudley's EEOC

Charge.  As summarized by WMATA in its Motion for Summary Judgment:

> All the alleged actions are spread over a three-year period.  They involve different
> WMATA management employees in different departments, including those
> persons in the Office of Civil Rights.  Mr. Dudley has alleged racially hostile acts
> against him by both African-American management and other employees (Joseph
> Royer, Scottie Borders, and Devin L. Walker) and Caucasian management
> employees (James Lacey and David Michaels).   Mr. Dudley has complained
> about actions taken against him by both African-American co-workers (Peter
> White, Kehinde Ogundiran) and Caucasian co-workers (William Adams, Barton
> Spicer).   Mr. Dudley has been suspended for threats of harm to both his
> supervisor Mr. Lacey and for threats of harm to his co-workers, both Caucasian
> and African-American.   (Peter White and James Lacey, respectively).   The
> alleged discriminatory officials are in different departments (Bus Maintenance,
> Bus Planning, and WMATA Office of Civil Rights).

Def.'s Mot. Summ. J. 17.  Especially when it appears plaintiff is trying to bootstrap unexhausted

discrimination and relation claims into his exhausted EEOC Charge—to possibly circumvent the

requirements of Title VII—the Court should demand *some* connection between the actions.  That

kind of connection simply does not exist for many of the actions plaintiff complains about.  *See*

*Wade v. District of Columbia*, 780 F. Supp. 2d 1, 19 (D.D.C. 2011) (rejecting plaintiff's effort to

transform amalgamation of disparate treatment claims into cause of action for hostile work

environment for lack of connection in pervasive pattern of severe harassment) (*citing Lester*, 290

F. Supp. 2d at 33 ("Discrete acts constituting discrimination or retaliation claims…are different

in kind from a hostile work environment claim that must be based on severe and pervasive

discriminatory intimidation or insult.")).  As another court in this Circuit confronted the issue:

> Where, as here, a plaintiff adopts a "kitchen sink" approach to crafting a hostile
> work environment claim, and when that approach is challenged, it is incumbent
> upon her to come forward with some explanation as to how her claim actually
> works under a hostile work environment theory.  In this case, [plaintiff] has made
> no attempt—none—to crystallize for the Court how these disparate acts could be
> seen by a trier of fact as sufficiently related to coalesce into a single hostile work
> environment.  When viewed in their totality, as [plaintiff] presses this Court to

view them, the Court can only conclude that these acts are so different in kind and remote in time that they cannot possibly comprise part of the same hostile work environment.

*Mason v. Geithner*, 811 F. Supp. 2d 129, 179 (D.D.C. 2011).

In addition to the discrete events detailed in Part I, Dudley points to several other events as contributing to his hostile work environment claim, including:

- WMATA paid White employees for a full eight-hour day when they clocked in late, but docked the pay of Black employees who did the same.  Pl.'s Opp'n 11; Ex. 47 to Pl.'s Opp'n.

- In 2010 "White employees hung a sign in the bus maintenance shop on the welding curtain that read "Redneck Yacht Club," which the African-American employees felt was racist and offensive.  The sign was removed only after the union shop steward spoke to the White employees involved.  Management did not intervene in the incident."  Pl.'s Opp'n 12; *see also* Exs. 3, 5 to Pl.'s Opp'n.

- In May 2008, Dudley claims that Lacey changed test results to fail two African-American employees.  (Dudley did not take this test.)  The WMATA Civil Rights Office declined to investigate the matter, and management offered to redo the test.  An African American employee who initially passed the test, James Lumpkins, refused to retake the test.  After it was confirmed that Lumpkins had indeed passed the practical test, he was promoted.  Pl.'s Opp'n 12; Ex. 5 to Pl.'s Opp'n.

- Dudley contends that "Lacey assigned overtime work in a discriminatory manner instead of following the rules of seniority.  At one time, two White employees…had more overtime than all of the other employees in the shop put together.  About three-quarters of the employees supervise by Lacey were black."  Pl.'s Opp'n 12–13; *see also* Exs. 4, 5, 43 to Pl.'s Opp'n.

- The WMATA Office of Civil Rights refused to investigate allegations made by James Lumpkins that White employees were improperly promoted.  Pl.'s Opp'n 13; Ex. 5 to Pl.'s Opp'n.

- Lacey allegedly usurped and interfered with Lumpkins's authority to supervise White employees in Lumpkins's group, and generally undermined his authority.  *Id*.

When the Court considers all of these events, along with those previously detailed, plaintiff has still failed to make out a hostile work environment claim.

Dudley was not directly involved with several of the examples cited as contributing to a hostile work environment. Dudley was not present at the toolbox meeting where Lacey made the "tap dance" comment; he was only there for the subsequent apology. Ex. 24 to Def.'s Mot. Summ. J.; Def.'s SMF ¶ 26; Pl.'s SMF 10 (agreeing that Def.'s SMF ¶ 26 is undisputed). One of Dudley's coworkers, James Lumpkins, alleges that Lacey changed test scores to disqualify Black candidates for promotion. Lumpkins Decl. ¶ 9. But there is no indication Dudley took the test or had any direct involvement in this controversy. Lumpkins states that he complained about the promotion of Black employees, *id.* ¶ 7, but Dudley was not one of those employees allegedly denied a promotion. Whether Lacey interfered with Lumpkins's ability to supervise is not immediately relevant, especially when Dudley does not claim he was supposed to report to Lumpkins, not Lacey. *Id.* ¶ 10 ("Mr. Lacey dealt directly with the four White employees in my work group, usurping and interfering with my authority to supervise them.").[7] These events have a tangential, at best, relationship to Dudley and to the question of whether Dudley suffered a hostile work environment.

Incidents of workplace racism that did not directly involve the plaintiff may be relevant to whether there is a hostile work environment. If WMATA supervisors frequently used highly offensive racial slurs in reference to other Black employees—even when Dudley was not around—this could be relevant. *See, e.g., Hawkins v. Anheuser-Busch, Inc.,* 517 F.3d 321, 336 (6th Cir. 2008) (fact finder may consider similar acts of harassment of which plaintiff becomes aware during the course of his employment even if they were directed at others or occurred outside plaintiff's presence); *Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 190 (2d Cir. 2001)

---

[7]   For the sake of argument, the Court puts aside the question, "What does Lacey's undermining of Lumpkins have to do with Dudley?" Even then, several courts have found that this kind of "undermin[ing] of authority" does not "constitute severe and pervasive ridicule, harassment, or intimidation" necessary for a hostile work environment claim. *Rattigan v. Gonzales,* 503 F. Supp. 2d 56, 80 (D.D.C. 2007) (collecting cases).

(evidence of harassment directed at coworkers is relevant to an employee's own claim of a hostile work environment); *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 110-112 (3rd Cir. 1999) (same); *Schwapp v. Town of Avon*, 118 F.3d 106 111–12 (2d Cir. 1997) (plaintiff's second-hand knowledge of racially derogatory comments or jokes can impact the work environment).[8]  The Court should be careful when weighing this kind of evidence, especially when it is not direct and strong evidence of racial animus.  *See, e.g.*, *Nurriddin*, 382 F. Supp. 2d at 108 ("When racial statements are not made directly to a plaintiff, generally a hostile environment cannot be established."); *Lester*, 290 F. Supp. 2d at 31 (D.D.C. 2003) ("conduct directed at others rather than at plaintiff…is less indicative of a hostile work environment"); *Gleason v. Mesirow Fin'l Inc.*, 118 F.3d 1134, 1144 (7th Cir. 1997) ("the impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff").  The worry is that not only will the plaintiff try to bootstrap all of *his* unexhausted and time-barred discrimination and retaliation claims into his hostile work environment, but he will bring in all the unexhausted and time-barred claims of his co-workers for support.

Dudley also claims that Lacey assigned overtime in a racially discriminatory manner, and treated the timecards of White employees who reported late differently than those from Black.  Pl.'s Opp'n 11–13.  These are discrete discriminatory events that Dudley failed to separately charge and exhaust.  Furthermore, Dudley does not even mention these events in his Complaint.  For the reasons discussed *supra*, the Court is wary of letting Dudley compound unexhausted, discrete instances of discrimination into a hostile work environment claim.  *See, e.g.*, *Rattigan*, 503 F. Supp. 2d at 82 ("[C]obbling together a number of distinct, disparate acts will not create a hostile work environment….This is particularly true here because plaintiff failed to exhaust

---

[8]    These are among the cases cited by the plaintiff in his opposition brief.  *See* Pl.'s Opp'n 43.  It might be significant that Dudley did not offer any cases from courts within this Circuit.  The cases this Court found from this Circuit did not support the plaintiff's position.

administrative remedies for many of the discrimination and retaliation claims that he now incorporates into a hostile work environment claim.").

The next major problem is that Dudley fails to show that he suffered hostility because he was Black or complained about discrimination. Nothing in the record indicates that a Black supervisor suspended Dudley for getting into a fight with a Black co-worker because Dudley is Black. Title VII does not ban all workplace hostility, but makes employers liable when hostility is directed at a protected class or those engaging in protected activities. The Court remembers:

> Everyone can be characterized by sex, race, ethnicity or (real or perceived) disability; and many bosses are harsh, unjust and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

*Bryant v. Brownlee*, 265 F. Supp. 2d 52, 63 (D.D.C. 2003) (*quoting Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002)). Put another way, "the plaintiff must establish a causal connection between the harassment and her protected activity [or status] to succeed on the claim." *Lewis v. District of Columbia*, 653 F. Supp. 2d 64. 81 (D.D.C. 2009). "There is an evidentiary component to this principle: evidence that bears no connection to the plaintiff's protected status cannot support a hostile work environment claim. Therefore, courts should exclude from consideration employment actions that 'lack a linkage' to discrimination or retaliation." *Mason*, 811 F. Supp. 2d at 179 (internal citations omitted).

Dudley points to other instances of alleged racism in the workplace—disproportionate allocation of overtime, the "Redneck Yacht Club" sign, the "tap dance" comment—to suggest that other acts of hostility were motivated by racial animus. *See, e.g.*, Pl.'s Opp'n 41–42. None of these events—either on their own or taken together—are severe or persistent enough to contribute to a hostile work environment, or support a general inference that when management

mistreated a Black employee it was because of his race. *See, e.g., Meritor*, 477 U.S. at 67 (the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee would not affect the conditions of employment to [a] sufficiently significant degree to violate Title VII"); *George v. Leavitt*, 407 F.3d at 416–17 (holding that statements by three employees over a six-month period telling plaintiff to "go back where she came from," separate acts of yelling and hostility and allegations that plaintiff was singled out for undesirable work assignments were insufficient to demonstrate a hostile work environment); *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 518 (6th Cir. 2009) (granting summary judgment on hostile work environment claim to employer although the plaintiff "often overheard several employees use the word 'nigger' at work"); *Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 844 (8th Cir. 2002) (concluding that no severe or pervasive hostile work environment existed although the plaintiff had been exposed to racial poems and drawings of KKK, swastika, and a hooded figure on the bathroom wall); *Bryant v. Brownlee*, 265 F. Supp. 2d 52, 64 (D.D.C. 2003) (determining that no hostile work environment existed even though a coworker referred to the plaintiff as "nigger" and had stated that white men were first and black women were "at the bottom"). Secondly, it is not even clear from Dudley's affidavit or other exhibits that he personally saw or heard about, prior to this litigation, the "Redneck Yacht Club" sign. "Conduct that Plaintiff did not know about…cannot be used to establish that she was subjected to a hostile work environment." *Hutchinson v. Holder*, 815 F. Supp. 2d 303, 321 (D.D.C. 2011).

Dudley frequently alleges he got a "raw deal" after a disciplinary investigation—that he was unfairly punished or criticized for things that were not his fault.[9] But being "wronged" by a

---

[9] For example, Dudley complains that Lacey initially treated a July 2008 incident as "unprofessional behavior among co-workers" even though Dudley says, "Lacey was well aware that I did not instigate the matter," Dudley Aff. ¶ 10; that Dudley was wrongly given a written reprimand for "unprofessional behavior among co-workers" although Dudley claims that he "did nothing wrong," *id* ¶ 11; that Lacey wrongly criticized Dudley for not

personnel or disciplinary decision simply is not enough under Title VII. There must be some connection between the wrong and the plaintiff's membership in a protected class or engagement in protected activity. Other than conclusory statements, Dudley provides no evidence WMATA took unfair personnel action against him *in violation of* Title VII. *See Clarke*, 2012 WL 5505242, *4 ("Absent any supporting evidence [of discrimination], the plaintiff's unsupported *ipse dixit* does not create a triable issue of fact."); *Mason*, 811 F. Supp. 2d at 209 (plaintiff's simple assertion that "[he was] subjected to severe hostility on an almost daily basis" does *not* raise "an issue of fact regarding whether [he] suffered from a hostile work environment"). It is not the Court's job to determine whether it was fair to have Dudley assist a volunteer on a job or whether he actually threatened his co-workers with violence. As the D.C. Circuit stated in reference to Title VII discrimination:

> Employers obviously have to resolve factual disagreements all the time in order to make employment decisions regarding hiring, promotion, discipline, demotion, firing, and the like. In many situations, employers must decide disputes based on credibility assessments, circumstantial evidence, and incomplete information. But [plaintiff's] argument would mean that every employee who is disciplined, demoted, or fired for alleged misconduct could sue for employment discrimination based on race, color, religion, sex or national origin and—merely by denying the underlying allegation of misconduct—*automatically* obtain a jury trial….[This] would wreak havoc on district courts' orderly resolution of employment discrimination cases and improperly put employers in a damned-if-you-do, damned-if-you-don't posture when addressing disciplinary issues in the workplace.

*Brady*, 520 F.3d at 496. Absent some evidence of discrimination or retaliation, the Court has no role under Title VII in resolving whether Dudley actually committed the misconduct for which he was punished and reprimanded—no matter how wrong WMATA may have been. This Court is not a "court of personnel appeals." *Bryant*, 265 F. Supp. 2d at 63. Employers do not violate

---

completing a job, although Dudley provides a litany of reasons why he could not complete it sooner, *id.* ¶ 12; and that he was wrongly suspended in May 2010 and May 2011 for two incidents where he was not at fault, and was not the aggressor, *id.* ¶¶ 20–21.

Title VII because their non-discriminatory reasons are "wrong," they violate Title VII when their non-discriminatory reasons are pretext for unlawful discrimination. *Cf. George v. Leavitt*, 407 F.3d at 415 ("[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false.").

Finally, when the Court looks at the totality of the circumstances, reasonable jurors cannot find that Dudley was subjected to a "workplace [ ] permeated with discriminatory intimidation, ridicule, and insult." *Baloch*, 550 F.3d at 1201. "In order for a hostile work setting to be actionable, the environment must be both objectively and subjectively hostile, which means that a reasonable person would find the environment hostile or abusive and that the victim perceived it to be so." *Johnson v. Shinseki*, 811 F. Supp. 2d 336, 345 (D.D.C. 2011). A significant number of the incidents clearly amount to "petty slights [or] minor annoyances," *Burlington*, 548 U.S. at 68, including:[10]

- Receiving a verbal warning for parking his personal vehicle in the Bus II parking lot, where there is no indication that the warning was abusive or threatening, or led to any disciplinary action. *Cf. Bonnette v. Shinseki*, __ F. Supp. 2d __, 2012 WL 5986466, *11 (D.D.C. Nov. 30, 2012) ("A letter of reprimand is not materially adverse if it 'contained no abusive language but rather job-related criticism.'") (*quoting Herbert v. Architect of Capitol*, 766 F. Supp. 2d 59, 75 (D.D.C. 2011)).

- WMATA removing from Peter White's file the written reprimand White received for getting into a verbal altercation with Dudley, where there is no indication WMATA sought to favor White (who is himself Black) or disregard Dudley's safety. Dudley also complains that the initial investigatory report listed the event as "unprofessional behavior between co-workers," although Dudley was never disciplined for this incident. Dudley Aff. ¶ 10; Ex. 12 to Def.'s Mot. Summ. J. "[M]ere investigations by plaintiff's employer cannot constitute an adverse action because they have no adverse effect on plaintiff's employment." *Mack v. Strauss*, 134 F. Supp. 2d 103, 114 (D.D.C. 2001).

---

[10]   In the following section, the Court analyzes each action that allegedly contributed to the hostile work environment. Therein, the Court sometimes looks to cases regarding Title VII discrimination or retaliation, and considers whether the kinds of actions Dudley complains about constitute adverse or actionable actions under those standards. The Court recognizes that the events comprising a hostile work environment need not be individually actionable instances of discrimination. *See Craig*, 2012 WL 3126779, *3. But lacking precedent specific to a hostile work environment claim for certain "kinds" of events, these cases help the Court understand the severity and propensity to "alter the conditions of the victim's employment," *Baloch*, 550 F.3d at 1201, of each type of event.

- A June 2009 written reprimand for unprofessional conduct, when the reprimand did not lead to any disciplinary action and was not abusive, insulting, or threatening in tone. *See Bonnette*, 2012 WL 5986466, *11; *Herbert*, 766 F. Supp. 2d at 75.

- Being asked to complete the work of other employees, when that work was not considerably "dirtier" or more arduous than Dudley's normal work, and taking on this work did not significantly increase Dudley's hours. *Cf. Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997) ("[C]hanges in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes."); *Childers v. Slater*, 44 F. Supp. 2d 8, 19 (D.D.C. 1999) ("Mere inconveniences and alteration of job responsibilities will not rise to the level of adverse action.").

- Being "constructively demoted" by being asked to assist a lower-ranked employee on a job, when this "demotion" lasted less than a month, involved no decrease in pay or title, and essentially involved the kind of work Dudley typically does. *See*, *Mungin*, 116 F.3d at 1557; *Stewart v. Evans*, 275 F.3d 1126, 1136 (D.C. Cir. 2002) ("[P]ublic humiliation or loss of reputation does not constitute an adverse employment action under Title VII."). *See also Baloch*, 554 F.3d at 1197 ("[W]e have previously underscored our hesitancy to engage in 'judicial micromanagement of business practices' by second-guessing employers' decisions about 'which of several qualified employees will work on a particular assignment.'") (*quoting Mungin*, 116 F.3d at 1549); *Nunridden v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2005) ("The removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management cannot be characterized as sufficiently intimidating or offensive in an ordinary work place environment.").

   Furthermore, WMATA has offered a compelling non-discriminatory justification for asking Dudley to assist a lower-ranked employee—Dudley missed several days of work prior to being asked to assist. *See* Def.'s Mot. Summ. J. 9–10; Exs. 25–30 to Def.'s Mot. Summ. J.  Plaintiff's response that he did not need to be "brought up to speed," Pl.'s Opp'n 7; Ex. 6 to Pl.'s Opp'n, is not sufficient to infer that WMATA's proffered reasons for asking Dudley to assist were pretextual.

- Being denied unfettered access to his employment file, and only being able to look at the past years' worth of documents, where Dudley has not shown that WMATA was actively trying to harass him or dissuade him from engaging in protected activity.

- Lacey talking to Dudley in a harsh, critical, and condescending tone, and allegedly singling out Dudley for criticism.[11]  Courts recognize that some "bosses are harsh, unjust and rude" *Sullivan-Obst v. Powell*, 300 F. Supp. 2d 85, 96 (D.D.C. 2004).  But Dudley does not explain how this harsh tone was significantly more severe or pervasive than any

---

[11] Dudley's claims that Lacey singled out Dudley for unjustified write-ups and discipline, *see* Pl.'s Opp'n 37, falls under the discrete instances of discrimination and retaliation discussed specifically *supra*.

other rude or demanding boss, and does not show that Lacey's criticism involved threats of violence, serious intimidation, or racial insults.

A litany of cases shows that simply having a rude, harsh, or unfair boss is not enough for a hostile work environment claim. *See, e.g., Baloch*, 550 F.3d at 1201 (no actionable hostile work environment where, on multiple occasions, defendant yelled, used profanity, threatened arrest, and described plaintiff's work as "bullshit"); *Peters v. Dist. of Columbia*, 873 F. Supp. 2d 158, 192 (D.D.C. 2012) ("Even a highly stressful work environment is not the same as a hostile work environment imbued with the requisite pervasive discriminatory animus to support a Title VII claim."); *Wade*, 780 F. Supp. 2d at 19 (admonishment, micromanagement, criticism are typical "work-related actions by supervisors" that provide insufficient grounds for a hostile work environment claim); *Holmes–Martin v. Sebelius*, 693 F. Supp. 2d 141, 165 (D.D.C. 2010) (plaintiff's claims that she was publicly criticized, received unwarranted criticism in her performance evaluations, given reduced job responsibilities, excluded from meetings, and received unrealistic deadlines were not sufficiently severe or pervasive to support a hostile work environment claim); *Franklin v. Potter*, 600 F. Supp. 2d 38, 77 (D.D.C. 2009) ("[T]he fact that an employee and his immediate supervisor repeatedly 'butted heads,' that the supervisor 'frequently yelled at him during discussions about his work,' and that the supervisor 'threatened him' with job-related consequences for his refusals to meet workplace expectations does not demonstrate a hostile work environment pervaded by discrimination or retaliation."); *Smith v. Jackson*, 539 F. Supp. 2d 116, 138 (D.D.C. 2008) ("[G]eneral allegations that [the supervisor] frequently yelled at [plaintiff] during discussions about his work over a period of several weeks…does not demonstrate a work environment that was pervaded by discrimination….[A]n 'intense' manager does not a hostile work environment make."); *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 56 (D.D.C. 2004) ("Criticisms of a subordinate's work and expressions of disapproval (even loud expressions of disapproval) are the kinds of normal strains that can occur in any office setting.").

This conduct, individually or collectively, is not "sufficiently extreme to constitute an alteration in the conditions of employment, so that Title VII does not evolve into a 'general civility code'" *Konah v. District of Columbia*, __ F. Supp. 2d __, 2013 WL 38931, *11 (D.D.C. Jan. 3, 2013) (*quoting Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998)). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788; *see also Harris*, 510 U.S. at 21 ("Conduct that is not severe or pervasive enough to

create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.").

When the Court looks at the whole picture, it does not see a plausible hostile work environment claim. Count II suffers from many pervasive flaws, and fails as a matter of law. It is true that hostile work environment claims are "characterized by a series of events that cumulatively give rise to a claim." *Craig*, 2012 WL 3126779 at *3. These events do not all have to be individually actionable. *Id.* This does *not* mean, however, that a plaintiff may string together a series of discrete unexhausted claims of discrimination, largely unrelated complaints from coworkers, minor annoyances, and subjective harms to make a valid claim. *Cf. Rattigan*, 503 F. Supp. 2d at 82 ("[C]obbling together a number of distinct, disparate acts will not create a hostile work environment."); *Bonnette v. Shinseki*, __ F. Supp. 2d __, 2012 WL 5986466, *10 (D.D.C. Nov. 30, 2012) ("[T]he law is clear that 'purely subjective injuries' such as dissatisfaction with a reassignment, public humiliation, or loss of reputation, are not adverse actions.") (internal quotation marks omitted). The cumulative effect of many de minimis harms is not a workplace filled with "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment." *Harris*, 510 U.S. at 21. Based on the evidence proffered, and drawing all reasonable inferences in favor of plaintiff, the Court finds that Dudley has failed to make out a prima facie claim for hostile work environment and that a reasonable jury could not find that Dudley suffered from a work permeated with severe intimidation, ridicule, and insult. Therefore, the Court enters summary judgment for WMATA on Count II.

### C.      Dudley's Count III Retaliation Claim

Dudley claims that he engaged in a series of protected activities—in addition to his 2008 EEOC Charge—and has suffered a number of retaliatory adverse actions.  *See, e.g.*, Pl.'s Opp'n 27–30.  The adverse actions and retaliatory acts Dudley complains of are essentially the same acts Dudley uses as the bases for his discrimination and hostile work environment causes of action.  WMATA challenges Dudley's retaliation claims on two bases:  (1) Dudley failed to exhaust his administrative remedies; and (2) Dudley has failed to make out a prima facie claim for discrimination.  Def.'s Mot. Summ. J. 14–17.  In lieu of offering legitimate, non-retaliatory reasons for taking adverse action, WMATA attacks Dudley's prima facie case directly— claiming that Dudley did not suffer an adverse action until at least seventeen months *after* the protected activity.  *Id.* at 16.  Thus, the issue is not retaliation *vel non*, but whether Dudley has made out a prima facie case.[12]  First, the Court must determine what has been properly exhausted and focus its analysis of retaliation claims on those events properly before this Court.

### 1.      Exhaustion of Administrative Remedies for Retaliation Claims

As with Dudley's discrimination claim, there are problems with timely administrative exhaustion for Dudley's retaliation claim.   Neither Dudley's EEOC Charge nor Intake Questionnaire suggests that WMATA suspended Dudley in 2007 in retaliation for earlier protected activity.  Dudley did not file any subsequent EEOC Charges claiming retaliation.

The Supreme Court, in *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), discussed the timely filing of charges and the exhausting of administrative remedies for discrete

---

[12]   WMATA, in its reply brief, responds to each allegedly retaliatory event in turn.  Def.'s Reply 7–16.  However, looking at each of WMATA's responses, the purpose of each is not to provide a valid, non-discriminatory justification for each action—thus making the issue retaliation *vel non*.  Instead, WMATA explains how each event is either: (1) not an adverse action; (2) not sufficiently related to the original EEOC Charge to raise an inference of retaliation; or (3) a discrete discriminatory event requiring a separate charge under *Morgan*.  *See id.*  WMATA remains focused on attacking Dudley's prima facie case of retaliation directly.

retaliation claims.   The Court declined to apply a "continuing practice" approach—like the approach used for hostile work environment claims—to retaliation claims.   The Court found "no indication that the term 'practice' [as used in Title VII] converts related discrete acts into a single unlawful practice for the purposes of timely filing."   *Id*. at 111.   The Court has "repeatedly interpreted the term 'practice' to apply to a discrete or single 'occurrence,' even when it has a connection to other acts."   *Id*.  Following this, the Court held:

> [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges alleging that act.  The charge, therefore, must be filed within the 180- or 300-day time period after the discriminatory act occurred.  The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.

*Id*. at 113.  Even when there are "serial violations," "each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"   *Id*. at 114.  A plaintiff can only "file a charge to cover discrete acts that 'occurred' within the appropriate time period,"   *id*., and the Court made clear that a "discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened,'" *id*. at 110.

Following *Morgan*, courts in this Circuit have split over whether "a plaintiff is required to separately exhaust his or her administrative remedies for every discrete act of discrimination or retaliation, regardless of whether the claims are 'like or reasonably related' to claims contained in the administrative complaint."   *Pierson*, 821 F. Supp. 2d at 366 (citing *Lewis*, 535 F. Supp. 2d at 7).   Some courts have "adopted a narrower reading of *Morgan* in the context of retaliation claims."   *Pierson*, 821 F. Supp. 3d at 366.   "These courts have held that separate exhaustion is not required for acts of retaliation occurring after the filing of an administrative complaint that would have come within the 'scope of any investigation that reasonably could

have been expected to result from [the] initial [administrative] charge of discrimination.'"  *Id.*

(quoting *Hazel v. WMATA*, 2006 WL 3623693, at *8 (D.D.C. Dec. 4, 2006)).

This Court has previously declined to take such a narrow reading of *Morgan*.  In *Perry v.*

*Clinton*, 831 F. Supp. 2d 1 (D.D.C. 2011) (Lamberth, C.J.), this Court held that a plaintiff must

exhaust his "'administrative remedies...for each discrete act of discrimination alleged or lose the

ability to recover for it.'"  *Id*. at 11–12.  This Court has also stated, in *Romero–Ostolaza v. Ridge*,

370 F. Supp. 2d 139, 149 (D.D.C. 2005) (Lamberth, J.), that:

> *Morgan* rejected the so-called continuing violation doctrines that allowed
> plaintiffs to recover for discrete acts of discrimination or retaliation that had not
> been separately exhausted but were "sufficiently related" to a properly exhausted
> claim.  The *Morgan* Court was emphatic that "strict adherence to the procedural
> requirements specified by the legislature is the best guarantee of evenhanded
> administration of the law," *Morgan*, 536 U.S. at 105, and that recovery was
> precluded "for discrete acts of discrimination or retaliation that occur outside the
> statutory time period," *id.* at 105.

> Although *Morgan* bars recovery for, on its facts, discrete acts occurring before the
> statutory time period, Morgan has, on the whole, been understood to also bar
> discrete acts occurring after the time period, after the filing of an administrative
> complaint, when a plaintiff does not file a new complaint or amend the old
> complaint but instead presents these acts for the first time in federal court.

> Given *Morgan*'s emphasis on strict adherence to procedure and on the
> severability of discrete acts such as termination, failure to promote, and denial of
> transfers, *see* 536 U.S. at 114, and given *Morgan*'s rejection of the various
> continuing violation doctrines of the Circuit Courts, it makes sense to apply
> *Morgan* to bar subsequent discrete acts that a plaintiff fails to exhaust in the
> administrative process.  Requiring a plaintiff to exhaust each discrete claim of
> discrimination or retaliation comports with the purpose of the exhaustion doctrine
> to give the agency notice of a claim and [the] opportunity to handle it internally
> and ensures that only claims plaintiff has diligently pursued will survive.  Further,
> requiring exhaustion encourages internal, less costly resolution of Title VII
> claims.

*Id*. at 148–49 (selected citations and quotation marks omitted).  This Court continues to believe

this is the correct way to approach administrative exhaustion for retaliation claims post-*Morgan*.

Plaintiff cites many pre-*Morgan* cases to argue that exhaustion is not necessary for new instances of retaliation.  *See* Pl.'s Opp'n 21–23.  This Court cannot accept an interpretation of *Morgan* that completely ignores the Supreme Court's holding that "each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice'" that must be separately charged and exhausted. *Morgan*, 536 U.S. at 114.  However, even if the Court were willing to accept the narrower reading of *Morgan* that some courts in this Circuit have applied, Dudley has still failed to state a prima facie claim for retaliation.

Applying the narrow reading of *Morgan*—which this Court only applies *ad arguendo*— the Court must determine whether a later act of retaliation would fall within the "scope of any investigation that reasonably could have been expected to result from [the] initial [administrative] charge of discrimination."  *Hazel*, 2006 WL 3623693, at *8.  The Court can imagine three broad categories of retaliation claims that may fall under this rule.

*First*, a "previously filed EEOC complaint of retaliation must [not] be amended to add subsequent acts of retaliation that are alleged to be just like the retaliatory acts alleged in the EEOC Charge and are an ongoing continuation of them."  *Id.* at *6; *see also* W*edow v. City of Kansas City, Mo.,* 442 F.3d 661, 674 (8th Cir. 2006) ("where the subsequent retaliatory acts [are] of a like kind to the retaliatory acts alleged in the EEOC Charge, [and are] specified to be of an ongoing and continuing nature[,]" separate administrative exhaustion is not required); *Webb v. District of Columbia*, 864 F. Supp. 175, 184 (D.D.C. 1994).

*Second*, if the actions described in the EEOC Charge do not—in themselves—constitute Title VII discrimination, but could constitute retaliation for earlier protected activity, the Court may construe the Charge as stating a retaliation claim.  Therefore, for the actions described in the

Charge, the plaintiff will have exhausted his administrative remedies for a retaliation claim, even though the plaintiff did not check the "retaliation" box or use the magic words in his charging documents.

*Third,* administrative exhaustion is not required for acts of retaliation taken in response to a properly exhausted charge.  That is, Dudley would not need to file a separate EEOC Charge for retaliatory acts WMATA took in response to his January 2008 Charge.

What the Court *cannot* accept is a suggestion that, full stop, "administrative exhaustion is not required for new acts of retaliation."  Pl.'s Opp'n 21.  That is, once a plaintiff files an EEOC Charge, every act of retaliation that follows is exempt from the administrative process.  The Court needs to find *some* connection between the exhausted claims and the retaliatory acts, or it could render much of Title VII's administrative procedures meaningless.

### 2.    Dudley's Possibly-Exhausted Retaliation Claims

The Court will accept, for the sake of argument, the narrower reading of *Morgan* that some courts in this Circuit have applied.  The Court will consider which acts would have come within the scope of an EEOC investigation of Dudley's exhausted January 2008 charge, and whether these acts constitute retaliation under Title VII.  *Cf. Willis v. Winter*, 540 F. Supp. 2d 178, 184–85 (D.D.C. 2008) ("[A]though the complaint filed in this Court alleges incidents going beyond those underlying plaintiff's 2003 administrative complaint, the Court must limits its consideration of plaintiff's discrimination and retaliation claims to those arising from these incidents in the spring of 2003, because she has failed to administratively exhaust with respect to any others.").  Even under the legal standard most favorable to Dudley, the plaintiff has not made out a valid retaliation claim.

First, the Court will consider whether Dudley's one-day suspension on June 17, 2007, could have been retaliation for some earlier protected activity. "To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a statutorily protected activity, (2) a reasonable employee would have found the challenged action materially adverse, and (3) there existed a causal connection between the protected activity and the materially adverse action." *Burns v. WMATA*, __ F. Supp. 2d __, 2013 WL 266463 *4 (D.D.C. Jan. 24, 2013). Certainly, Dudley's one-day suspension counts as materially adverse and could have deterred a reasonable person from engaging in protected activity.[13] But if this suspension was retaliatory, what was it in retaliation for? What was the earlier protected activity?

Dudley claims that he "and another African-American Sign and Shelter Mechanic, Freddie Kenley [ ], complained to Lacey in 2007 about Adams being able to come to work out of uniform and never being treated as late while [Dudley and Kenley] were treated as late when [they] came to work a few minutes late." Dudley Aff. ¶ 5. Dudley is vague about *when* in 2007 he and Kenley complained to Lacey—whether they complained before or after Lacey suspended Dudley in June. Kenley's Affidavit does not clarify matters. Dudley claims that after his June suspension, and after receiving another write-up for being late in August, he and Kenley "filed internal complaints of discrimination with the WMATA Civil Rights Office in September 2007, claiming disparate treatment and seeking uniform treatment of WMATA's attendance policy for Black and White employees." Dudley Aff. ¶ 6; *see also* Kenley Aff. ¶ 5 ("I filed an internal discrimination complaint with WMATA's Civil Rights Office in about August 2007 because I felt that there was disparate treatment between African-Americans and Whites with respect to disciplinary action for coming to work late."). These internal grievances certainly qualify as

---

[13]     This inference is seriously undercut by the fact that Dudley filed an internal complaint in August 2007 and an EEOC Charge in January 2008. *See* Exs. 10 & 11 to Pl.'s Opp'n.

protected activities, but they come *after* Dudley's June 2007 suspension.  It is not clear that Dudley and Kenley's 2007 conversation with Lacey was a separate event that happened months before the men filed internal grievances.   There is no indication that Dudley or Kenley complained about enforcement of the attendance policy before Dudley's 2007 suspension.

Dudley has the burden of pleading and proving the elements of a prima facie retaliation claim, including showing "a causal connection between the protected activity and the materially adverse action."  *Burns*, 2013 WL 266463 at *4.   At a minimum, to establish a causal connection, Dudley must show that the protected activity happened *before* the adverse action. He has failed to do so.  Certainly, it may be possible that when Dudley and Kenley "complained to Lacey in 2007 about Adams being able to come to work out of uniform," Dudley Aff. ¶ 5, this happened shortly before Dudley's June suspension.   And at summary judgment, typically the Court construes the facts in the light most favorable to the non-moving party.  *Anderson*, 477 U.S. at 255.   However, in this instance, Dudley would have the burden of proving that he engaged in protected activity before he was suspended.   "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   He cannot avoid summary judgment by providing vague or incomplete information about facts he would have to prove at trial.  *Cf. Engl v. Aetna Life Ins. Co.*, 139 F.2d 469, 473 (2d Cir. 1943) (allowing an opposing party to "reserve one's evidence when faced with a motion for summary judgment" would render "useless the very valuable remedy of summary judgment").   Since the Court cannot infer a causal connection between

Dudley's June 2007 suspension and some protected activity, this reading of Dudley's EEOC Charge cannot support a retaliation claim.

Second, the Court will consider whether WMATA took any actionable retaliatory actions in response to Dudley's January 2008 EEOC Charge or his fall 2007 complaints about disparate enforcement of the attendance policy.[14]   The charge and the internal grievances are clearly protected activities, so the issue becomes when did Dudley next suffer a materially adverse action, and whether there is a connection between the adverse action and the protected activity. The Supreme Court held that "the antiretaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington*, 548 U.S. at 64.   To show that he suffered a materially adverse action, Dudley "must show that a reasonable employee would have found the action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 68 (internal quotation marks omitted).   The focus is on whether the employer's actions were likely "'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." *Id*. (*quoting Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)).   This standard considers "reactions of a *reasonable* employee because…[the] standard for judging harm must be objective." *Id*. (emphasis in original).

Once the plaintiff has identified an adverse action, he must make a connection between the adverse action and some protected activity.   Plaintiffs, if lacking direct evidence that the protected activity caused the adverse action, "may raise a presumption of causation by showing that the employer had knowledge of the protected activity and that the adverse action occurred

---

[14]   The Court is willing to consider whether WMATA retaliated against Dudley not only for filing his formal EEOC Charge, but for engaging in earlier protected activity regarding the attendance policy.  The Court thinks that such retaliation might come within the scope of investigating Dudley's EEOC Charge.

soon thereafter." *Vance v. Chao*, 496 F. Supp. 2d 182, 186 (D.D.C. 2007). "[A] plaintiff wishing to rely on this presumption must allege that the protected activity and the adverse action occurred very close in time." *Id.* The Supreme Court has suggested that a three- or four-month period between a protected activity and an adverse action is insufficient to imply causation, and that a twenty-month period "suggests, by itself, no causality at all." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). Courts in this Circuit "have general accepted time periods of a few days up to a few months, and have seldom accepted time lapses outside of a year in length." *Payne v. Salazar*, __ F. Supp. 2d __, 2012 WL 5187760, *12 (D.D.C. Oct. 21, 2012). A plaintiff does not need to rely on the presumption afforded by temporal proximity and may submit direct evidence that he suffered an adverse action in retaliation for engaging in protected activity. *Vance*, 496 F. Supp. 2d at 186.

Applying these principles, the task is to: (1) identify the next adverse action that follows the protected activity; and (2) consider whether the time elapsed can raise an inference of causation. If there is temporal proximity, the Court then considers whether WMATA has explained its actions in a non-discriminatory manner, and whether Dudley can show that those reasons are pretextual. If there is no temporal proximity, the Court then considers whether Dudley has introduced direct evidence of discrimination and retaliation.

What is the next event that might count as an adverse action? The plaintiff offers several possibilities.

- "Following the filing of the internal and EEOC complaints, Lacey and other management officials treated Dudley more harshly. Lacey regularly spoke to Dudley in a derogatory and condescending manner at morning 'toolbox' meetings where he gave out assignment to his employees." Pl.'s Opp'n 3–4. Dudley claims Lacey "singled [him] out for criticism, used intimidating language towards [him], [and] constantly harassed [him]."[15] Dudley Aff. ¶ 8.

---

[15] The Court considers Dudley's claims that Lacey gave Dudley retaliatory work assignments and wrote false statements about Dudley's work separately, as those incidents can be tied to specific times.

Dudley is not clear how long after he filed his complaints that Lacey started treating him this way.   However, it is not necessary to consider causation or temporal proximity because these actions do not amount to a materially adverse action in the first place.   The law is clear that "'purely subjective injuries,' such as dissatisfaction with a reassignment, public humiliation, or loss of reputation are not adverse actions."   *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006); *see also Burlington*, 548 U.S. at 68 ("petty slights, minor annoyances, and simple lack of good manners" cannot form the basis of a retaliation claim); *Baloch*, 550 F.3d at 1197, 1199 ("sporadic verbal altercations or disagreements" and "false accusations without negative employment consequences do not qualify as adverse actions for retaliation claims").   Following the Supreme Court's objective standard for material adversity, the D.C. Circuit declined to find a supervisor's "alleged profanity-laden yelling as actionable adverse actions."   *Baloch*, 550 F.3d at 1199.   Dudley fails to explain the "tangible job consequences" following Lacey's alleged mistreatment, *Whittaker v. Northern Illinois University*, 424 F.3d 640, 648 (7th Cir. 2007), or how Lacey's tone would deter a reasonable person from engaging in protected activity.   As discussed *supra*, the events described by Dudley do not describe a workplace permeated by abusive conditions.   Dudley has not shown that Lacey's condescension and criticism were so severe and pervasive that it would deter a reasonable person from engaging in protected activity—nor has he introduced any evidence that Lacey mistreated Dudley to retaliate or deter Dudley from filing an EEOC Charge or internal grievance.

- "In July 2008 Lacey gave Dudley a verbal warning for parking his personal vehicle in the Bus II parking lot behind the shop and transferring his tools between his personal vehicle and his work truck, even though all of the Mechanics do the same thing on a daily basis and Lacey did not reprimand other employees."  Pl.'s Opp'n 4.

The Court is already at the outer bounds of acceptable temporal proximity—this event happens six months after Dudley filed his EEOC Charge.  Either way, it is clearly not a materially adverse action.  "A letter of reprimand is not materially adverse if it 'contained no abusive language but rather job-related criticism.'"  *Bonnette*, 2012 WL 5986466, *11 (*quoting Herbert*, 766 F. Supp. 2d at 75).  Courts in this Circuit have analyzed verbal warnings under this standard.  *See*, *e.g.*, *Shinseki*, 824 F. Supp. 2d at 120–21.  Dudley may claim that it was unfair for Lacey to verbally warn Dudley but overlook other offenders, but Dudley does not allege that this interaction contained abusive language or went beyond job-related criticism.  There is no direct connection between this incident and Dudley's EEOC Charge, Dudley's employment status, or his willingness to engage in future protected activity.

- "On July 19, 2008, at a meeting on the loading dock Lacey mentioned to several Sign and Shelter Mechanics that a bus sign had been installed upside down and needed to be fixed. Freddie Kenley, Kenneth Ray, and Peter White (Carribean [*sic*]-Black) were on the loading dock and Dudley was down below loading his tools into his truck.  Kenley and Ray laughed and White apparently took offense and went down from the loading dock and confronted Dudley who had not been involved in the conversation.  White made threatening comments to Dudley, but Lacey didn't say anything to White.  Later that day, White confronted Dudley again, asking "how do you want to settle this."  Even though Lacey was well aware that Dudley did not instigate the matter, he did an Investigation Report treating it as "unprofessional behavior between co-workers," as if Dudley was at fault as well as White.  White also wrote a letter to the President of Local 689 threatening harm to Dudley and gave a copy to Lacey, but Lacey never told Dudley about it at the time.  Lacey sent the information about the incidents on to senior management and White was given a written warning and required to attend a Workplace Violence Awareness Class.  However, White grieved the matter and it was settled with the removal of the documents about it from the files."  Pl.'s Opp'n 4.

Again, the Court is at the outer edge of acceptable temporal proximity—six months.  Again, this event does not amount to an adverse action.  It is important to note that WMATA never disciplined Dudley for this interaction.  Dudley seems upset that Lacey initially characterized the event as "unprofessional behavior between co-workers" in his initial Investigation Report.  But after WMATA fully investigated the matter, they did not discipline, warn, or admonish Dudley

in any way.  The fact that Lacey—in the early stages of investigating the event—suggested that the misconduct may have been mutual is *not* an adverse action when it leads to no discernible consequences.  *See Ginger v. District of Columbia*, 477 F. Supp. 2d 41, 53 (D.D.C. 2007) ("The mere initiation of an investigation into plaintiff's conduct is not an adverse employment action when it has no effect on the plaintiff's employment.").  To find otherwise would be to invite *massive* micromanagement of employment matters.  Dudley also seems upset that White prevailed in his grievance and had documents relating to the incident removed from his files.  How does this directly affect Dudley's employment status?  Dudley does not allege that White continued to threaten Dudley or that management let such harassment continue.  Dudley makes no connection between this event and his EEOC Charge.

The next incident described by Dudley happened on June 24, 2009—almost a year and a half after Dudley filed his EEOC Charge.  Even this event does not count as an adverse action.  At that time, Lacey investigated an altercation between Dudley and his co-worker Ogundiran.  Lacey took statements, and after completing his investigation took no further action.  Dudley objects to having the investigative report placed in his file, and likens it to a "write-up."  *See* Pl.'s Opp'n 5.  However, as this Court has just noted, "A letter of reprimand is not materially adverse if it 'contained no abusive language but rather job-related criticism," *Bonnette*, 2012 WL 5986466, *11; and, "The mere initiation of an investigation into plaintiff's conduct is not an adverse employment action when it has no effect on the plaintiff's employment," *Ginger*, 477 F. Supp. 2d at 53; *see also Brown v. Mills*, 674 F. Supp. 3d 182, 191–92 (D.C. Cir. 2009) (plaintiff presented no evidence that a two month investigation of her actions adversely affected her career or her reputation, and therefore the investigation was not an adverse action).

The next potentially adverse action happens on July 31, 2009—almost seventeen months after Dudley filed his EEOC Charge.  This time lapse is *far* too long to infer causation.  Since Dudley cannot infer causation from temporal proximity, Dudley can pursue these claims if he provides *direct* evidence of a connection between these adverse actions and his January 2008 EEOC Charge.  *See Winston v. Clough*, 712 F. Supp. 2d 1, 11 (D.D.C. 2010) ("Moreover, a close temporal connection is not the only way to prove causation.  A plaintiff may also put forward direct evidence and disregard the presumption and its time limitations.") (internal quotation marks omitted).

However, the direct evidence needs to be compelling, as a delay of a year and a half suggests "no causality at all."  *Breeden,* 532 U.S. at 273; *see also Brodetski v. Duffey*, 199 F.R.D. 14, 20 (D.D.C. 2001) ("Although courts have not established the maximum time lapse between protected Title VII activity and alleged retaliatory actions for establishing a causal connection, courts generally have accepted time periods of a few days up to a few months and seldom have accepted time lapses outside of a year in length."); *Saunders v. DiMario*, 1998 U.S. Dist. LEXIS 23163, *15 (D.D.C. 1998) ("The greater the time that elapses between the protected activity and the alleged acts of retaliation the more difficult it is to demonstrate any causal connection, and, absent any other evidence, where the gap is sufficiently great, it is appropriate to grant judgment as a matter of law.").  Such direct evidence might include witnesses attesting that WMATA managers said they were taking adverse action against Dudley because of his protected activity, or threatening Dudley with adverse actions if he continued to complaint.  *Cf. Hampton*, 760 F. Supp. 2d at 49 ("direct evidence" is "expressions by the decision maker that are evidence of discriminatory or retaliatory intent"); *Barry v. U.S. Capitol Guide Bd.*, 636 F. Supp. 2d 95, 107 (D.D.C. 2009) (providing hypothetical examples of direct evidence of retaliation); *see also*

*Lemmons v. Georgetown Univ. Hosp*. 431 F. Supp. 2d 76, 86 (D.D.C. 2006) ("Direct evidence of discrimination is evidence that, if believed by the fact finder, proves the particular fact in question without any need for inference.  Such evidence includes any statement or written document showing a discriminatory motive on its face.").  This kind of direct evidence of retaliation is absent here.

Dudley claims that the evidence shows that there was a "'pattern of antagonism' following the protected conduct" that "give[s] rise to an inference of retaliation."  Pl.'s Opp'n 30. The events comprising this "pattern of antagonism" are essentially the same events Dudley tries to use to support a hostile work environment claim.  But as this Court has previously explained in its hostile work environment section, the events of which Dudley complains basically consist of: (1) discrete instances of discrimination and retaliation that have not been separately charged or exhausted; (2) events pertaining to other employees that have a tangential, at best, relationship to Dudley; and (3) events Dudley found harsh, rude, annoying, unfair, or embarrassing, but lack sufficient severity or connection to Dudley's race or to his engagement in protected activity.  The Court finds no "pattern of antagonism" that would allow the Court to infer causation when there is such a long delay between the protected activity and adverse action.

Simply put, Dudley has not put forth any direct evidence that he suffered any subsequent adverse actions because he filed his January 2008 charge, or that WMATA was actively trying to dissuade Dudley from engaging in future protected activities.  Dudley asserts that he was disciplined because he complained about discrimination.  *See generally* Dudley Aff.  Dudley's— and his co-worker's—subjective feelings, conclusory statements, and ipse dixit are *not* direct evidence of retaliation or adverse action.  "Not everything that makes an employee unhappy is an actionable adverse action....While 'being aggrieved is necessary to state a claim for

retaliation…it is not sufficient to demonstrate that a particular employment action was adverse….[P]urely subjective injuries…are not adverse actions.'" *Broderick v. Donaldson*, 437 F.3d 1226, 1233 (D.C. Cir. 2006) (*quoting Holcomb*, 433 F.3d at 902) (formatting altered).

While Dudley's EEOC Charge did not specify retaliation, the Court considered whether WMATA retaliated against Dudley for filing that charge and complaining about inconsistent enforcement of the attendance policy. Dudley did not suffer an adverse action for at least a year and a half after filing his EEOC Charge. The Court cannot infer retaliation from temporal proximity, and Dudley has provided no direct evidence of retaliation. WMATA chose to attack Dudley's prima facie case directly—obviating the need to consider retaliation *vel non*. WMATA is correct that Dudley failed to make out a prima facie case of discrimination, and is entitled to summary judgment on Count III.

### 3. Instances of "Retaliation" the Court Will Not Consider

The Court will not consider discrete claims of retaliation that have no connection to Dudley's January 2008 EEOC Charge. Discrete claims of retaliation must be separately charged and exhausted within the appropriate limitations period. *See, e.g.*, *Morgan*, 536 U.S. at 113. After filing his EEOC Charge, Dudley continued to engage in protected activity, filing a number of internal grievances throughout 2008–2011. *See, e.g.*, Exs. 21–26, 28, 31 to Pl.'s Opp'n. Adverse actions shortly after these protected activities could support a retaliation claim—*if* separately charged and exhausted. These incidents would be discrete acts of retaliation, since Dudley is filing separate grievances relating to separate incidents. The Court cannot fold these separate events into Dudley's January 2008 charge; that would totally undermine the procedural requirements of Title VII.

Dudley claims he continued to send the EEOC documents, and sought to amend his charge. *See* Ex. 32 to Pl.'s Opp'n; Dudley Aff. ¶ 22. As mentioned before, Dudley did not include, as an exhibit, any correspondence between him and the EEOC about amending his charge. Simply sending the EEOC unsolicited documents about later, unrelated events does not circumvent Title VII's detailed administrative exhaustion requirements. *Cf. Morgan*, 536 U.S. at 108 ("'strict adherence to the procedural requirements specified by the legislature is the best guarantee of the evenhanded administration of the law.'") (*quoting Mohasco*, 447 U.S. at 826).

Furthermore, to make out a prima facie claim of retaliation, the plaintiff must establish that he suffered a materially adverse action *because* of his engagement in protected activity. *See*, *e.g.*, *Baloch*, 550 F.3d at 1198. It is hard to argue that the employer punished plaintiff *because* of plaintiff's protected activity, if the employer was completely *unaware* of plaintiff's protected activity. *See Byrd v. District of Columbia*, 807 F. Supp. 2d 37, 69 (D.D.C. 2011) (discussing whether employer was aware of protected activities); *cf. Howard Univ. v. Green*, 652 A.2d 41, 46 (D.C. 1994) (in discussing analogous D.C. antiretaliation provision modeled on Title VII: "Employer awareness that the employee is engaged in protected activity is [ ] essential to making out a prima facie case for retaliation."). In order to avoid exhaustion problems, Dudley might recast his "protected activities" as participating in the EEOC investigative process by continuing to send the EEOC documents. *See* Pl.'s Opp'n 27–28 ("[T]he protected conduct is not just the initial filing of the complaint; it is also the filing of the amendments and the participation in the subsequent proceedings. As previously indicated, the EEOC investigation continued for 3 ½ years until May 17, 2011, with Dudley providing voluminous documentation."). However, there is *no* indication that Dudley's supervisors were aware that Dudley continued to send the EEOC documents. There is no mechanism in place to notify WMATA that Dudley—short of actually

amending his charge—had been communicating with the EEOC and sending them new documents.  If WMATA officials had no idea that Dudley continued to mail documents to the EEOC, they could not have "retaliated" against Dudley for doing so.

Even when applying a very generous legal standard to determine which, if any, of Dudley's claims are exhausted, the Court finds that the undisputed facts show that Dudley has not make a prima facie claim of discrimination.  The Court found no evidence that his 2007 suspension was taken in retaliation for some earlier protected activity.  The Court found that after filing his EEOC Charge in January 2008, Dudley did not suffer an adverse action for at least a year and a half.  Dudley provided no direct evidence of retaliation.  Therefore, the Court enters summary judgment for WMATA on Count III.

## IV.    CONCLUSION

Plaintiff describes many different instances of alleged discrimination, retaliation, hostility, and abuse.  These events span several years and involve a number of different coworkers and WMATA supervisors.  In light of all these allegations, it is important for the Court to focus its attention only on claims that have been timely exhausted through the proper administrative channels.  Dudley only received one Right to Sue Letter, deriving from one EEOC Charge Dudley filed in January 2008.  Dudley's attempt to avoid separately charging and exhausting discrete instances of retaliation and discrimination, and to amalgamate a series of different events into a hostile work environment claim, fails.

Dudley has only one properly exhausted claim of discrimination, relating to his 2007 warning and one-day suspension for violating WMATA's attendance policy.  Dudley has not separately charged and exhausted any other discriminatory act—and Dudley has shown no equitable reason to forgive the failure to exhaust.  Accepting WMATA's proffer of a non-

discriminatory reason for suspending Dudley, and finding that Dudley has not introduced evidence sufficient to raise an inference of discrimination, the Court enters summary judgment for WMATA as to Count I.

The series of events Dudley complains about in his hostile work environment claim simply do not make out a viable claim.  Looking at the evidence proffered by the plaintiff, and drawing all reasonable inferences in its favor, a reasonable jury could not find that Dudley suffered from a work environment permeated with severe intimidation, ridicule, and insult. Therefore, the Court will grant WMATA summary judgment as to Count II.

Even under a very generous standard for administrative exhaustion of retaliation claims, Dudley has simply failed to make out a prima facie case for retaliation.  The time between the January 2008 EEOC Charge and the next potentially adverse event is far too great to infer causation by temporal proximity, and Dudley has provided no direct evidence of retaliation. Therefore, the Court will grant WMATA summary judgment as to Count III.  Having granted summary judgment to WMATA on all Counts, the Court will dismiss this case with prejudice.

A separate order consistent with this memorandum opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on February 20, 2013.